IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO


UNITED STATES OF AMERICA,   *   CASE NO.: 12-759(FAB)
                        *
     Plaintiff        *
                        *
vs                       *
                        *
LUIS GUZMÁN-BATISTA,     *
                        *
     Defendant        *   March 5, 2013
                        *   Hato Rey, Puerto Rico


**SUPPRESSION HEARING**

HELD BEFORE THE HONORABLE CAMILLE VÉLEZ-RIVE
UNITED STATES MAGISTRATE JUDGE
FEDERAL BUILDING, HATO REY, PUERTO RICO


APPEARANCES:

FOR PLAINTIFF     :    AUSA Alberto López, Esq.
                        AUSA Amanda Soto, Esq.

FOR DEFENDANT(s)  :    Carlos Vázquez, Esq.
                        Sulay Ríos-Fuentes, Esq.

COURTROOM DEPUTY  :   Ms. Yelitza Rivera

COURT REPORTER    :   FTR

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787)783-6623;(787)617-9487
E-mail: crystalinchaustegui@hotmail.com

1          P R O C E E D I N G S

2                                    (9:32 A.M.)

3          COURTROOM DEPUTY:   Criminal 12-759, United States

4    of America versus Luis Guzmán-Batista, Suppression Hearing.

5          Appearing for the Government, Ms. Amanda Soto and

6    Mr. Alberto López. Appearing for Defendant, Ms. Sulay Ríos

7    and Mr. Carlos Vázquez. Defendant is present in Court, and is

8    being assisted by the Official Court Interpreter.

9          MS. SOTO:   Good morning, Your Honor.

10         MR. LÓPEZ:   Good morning, Your Honor.

11         THE COURT:   Good morning.

12         MR. LÓPEZ:   The United States is ready to proceed.

13         UNIDENTIFIED SPEAKER:   Good morning, Your Honor. We

14   are ready to proceed.

15         THE COURT:   Okay, pursuant to the Motion to

16   Suppress, and the grounds under which it has been filed, the

17   burden is on Defendant. So, let's proceed.

18         Any witnesses that we have in the courtroom shall be

19   removed.

20         MS. RIÓS-FUENTES:   Your Honor, we call Agent Héctor

21   Rivera.

22                              PAUSE

23         MS. RIÓS-FUENTES:   Okay, Your Honor, we're going to

24   call Ms. Ada Batista.

25         THE COURT:   Where is Ms. Batista?

1    MS. RIÓS-FUENTES:   She's just outside. We're going

2    to...

3                              PAUSE

4         MR. LÓPEZ:   Your Honor?

5         THE COURT:   Yes.

6         MR. LÓPEZ:   Before we proceed with the testimony of

7    Ms. Batista, can we approach?

8         THE COURT:   Yes.

9    **(INAUDIBLE BENCH CONFERENCE.)**

10        COURTROOM DEPUTY:   Raise your right hand. Do you

11   swear that all the testimony you're about to give in the case

12   now before the Court is the truth, the whole truth, and

13   nothing but the truth, so help you God?

14        WITNESS:   I do.

15        COURTROOM DEPUTY:   Thank you. Be seated.

16        (Whereupon,

17                    **MS. ADA IVELISSE BATISTA-LÓPEZ**

18   after having been first duly sworn, was examined and, through

19   the Official Court Interpreter, testified upon her oath as

20   follows:)

21                     **DIRECT EXAMINATION**

22   BY MS. RIÓS-FUENTES:

23   Q.    Good morning.

24   A.    Good morning.

25   Q.    Could you please state your name for the record?

```
1   A.      My name is Ada Ivelisse Batista-López.

2   Q.      Ms. Batista, do you know Mr. Luis Guzmán-Batista?

3   A.      Yes, he's my son.

4   Q.      Your son, okay. Where do you reside?

5   A.      I live in Villalba, at Apiadero Ward (phonetic).

6              THE COURT:   Can I have the Interpreter please

7   approach the microphone for the Witness.

8              INTERPRETER:   For the Witness.

9              THE COURT:   Thank you.

10             INTERPRETER:   Yes, Your Honor, you're welcome.

11  BY MS. RÍOS-FUENTES:

12  Q.      Who lives with you at Apiadero Ward?

13  A.      I live there with my son, Luis Angel Guzmán.

14  Q.      For how long have you lived there?

15  A.      More than thirty years.

16  Q.      Okay, Ms. Batista, going back to October 9th, the day of

17  the alleged offense in this case... before going into that...

18  your son had an electronic monitoring device. Is that correct?

19  A.      Yes.

20  Q.      For how long?

21  A.      You mean that he had it on?

22  Q.      Yes.

23  A.      It had been... you know... it was going to be three

24  years.

25  Q.      Okay, and when, if at any time, was he allowed to go out
```

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1  of the house?

2  A.    When he had cases in Court.

3  Q.    Was that the only time he was allowed outside of the

4  house?

5  A.    Well, sometimes, if he got ill or something, I had to

6  call the Social Worker to obtain a permission.

7  Q.    So, he was in lock-down?

8  A.    Yes.

9  Q.    Okay, and your house is immediately behind your

10 mother's... your grandmother's house. Is that correct?

11 A.    Yes.

12 Q.    Okay, could Luis go to his grandmother's house?

13 A.    No.

14 Q.    Why was that?

15 A.    Because he had to remain in my house's balcony.

16 Q.    If he went to his... your grandmother's house, what

17 would happen?

18 A.    The monitor would ring or would sound off.

19 Q.    Do you know what the distance is from your house to your

20 grandmother's house?

21 A.    No.

22 Q.    No. But, it's a short distance?

23 A.    Uh huh, yes, yes.

24 Q.    And, on October 9th, the day of the facts in this case...

25        THE COURT:   Are we talking about 2012?

1    MS. RIÓS-FUENTES:   Yes, 2012. I'm sorry, Your

2 Honor.

3         THE COURT:   Okay.

4 BY MS. RIÓS-FUENTES:

5 Q.    On October 9, 2012, do you remember where Luis was at

6 around eleven, forty-five? Was he in your house?

7 A.    Yes.

8 Q.    Were you there?

9 A.    Well, I come out from work, I always go to see my

10 grandmother, and I go through the left side, and I always go

11 in to verify my grandmother always.

12 Q.    The grandmother whose house is right next to... right in

13 front of yours?

14 A.    In front, yes.

15 Q.    And, what time do you get out of work?

16 A.    I come out at eleven.

17         THE COURT:   Morning of night?

18 A.    Morning.

19 BY MS. RIÓS-FUENTES:

20 Q.    And, by eleven, thirty, you're usually home already.

21 Is that correct?

22 A.    Yes.

23 Q.    And, do you remember if that day, the 9th of October,

24 you saw Luis go out of the house?

25         MR. LÓPEZ:   Your Honor, She's being leading.

1          THE COURT:   I know, but you had not Honorable

2    Judge.

3          MR. LÓPEZ:   Yes, I know, but we have...

4          THE COURT:   Sustained, sustained.

5    BY MS. RIÓS-FUENTES:

6    Q.      On October 9th, did you see...

7          MS. RIÓS-FUENTES:   Let me rephrase, Your Honor.

8    BY MS. RIÓS-FUENTES:

9    Q.      To the best of your knowledge, where was Luis on

10   October 9th?

11         MR. LÓPEZ:   Your Honor, a time frame for that

12   question.

13         THE COURT:   Pardon?

14         MR. LÓPEZ:   A time frame for that question. On

15   October 9th, the whole day or at...

16         THE COURT:   Are you referring to a certain time

17   period or the whole day?

18         MS. RIÓS-FUENTES:   To the whole day, Your Honor.

19         THE COURT:   Okay.

20   **REPETITION, BY INTERPRETER, OF PREVIOUS QUESTION FOR BENEFIT**

21   **OF WITNESS.**

22   A.    In my house.

23   BY MS. RIÓS-FUENTES:

24         MS. RIÓS-FUENTES:   No further questions, Your

25   Honor.

1      THE COURT:   Cross.

2                    **CROSS EXAMINATION**

3  BY MR. LÓPEZ:

4  Q.      Good morning, Ms. Batista.

5  A.      Good morning.

6  Q.      Okay, Ms. Batista, your testimony here is that you

7  reside in Villalba, right?

8  A.      Yes.

9  Q.      In Apiadero Ward, right?

10  A.      Yes.

11  Q.      And, for how long you have been living there?

12  A.      More than thirty years.

13  Q.      So, you have been almost all your life there?

14  A.      Exactly, I was born and raised there.

15  Q.      And, since you were born and raised there, you know the

16  area very well, right?

17  A.      Yes.

18  Q.      You know your neighbors?

19  A.      Yes.

20  Q.      You know the houses around you?

21  A.      Yes.

22  Q.      Of course. Okay, Ms. Batista, and you mentioned that you

23  live there in that house, in your residence, with your son.

24  That's correct?

25  A.      Yes.

1   Q.     Nobody else? Just you and your son?

2   A.     Yes.

3   Q.    Okay, what about your husband?

4   A.    He lives with his mother.

5   Q.    Where?

6   A.    The house next door.

7   Q.    Okay, and you also mentioned that your son has an

8 electronic monitoring device, right?

9   A.    Yes.

10  Q.    And, he has been wearing that bracelet for almost three

11 years or three years, right?

12  A.    He was going to be three years wearing it on November

13 7th.

14  Q.    Of this year?

15  A.    No, last year.

16  Q.    Last year?

17  A.    2012. On November 7, 2012, he was going to be three

18 years wearing it.

19  Q.    Okay, so it's more than three years, right, three years

20 and a half, more or less?

21        THE COURT:  Three years and a half would be...

22 you're talking about... she's testifying as to the day the

23 event occurred. To today, it would be three years and a half.

24        MR. LÓPEZ:  Uh huh, yes.

25        THE COURT:  Oh, but you have to pose the question

1    that way.

2           MR. LÓPEZ:  Okay.

3           THE COURT:  Because I think she's...

4           MR. LÓPEZ:  Okay, I will rephrase the question.

5           THE COURT:  Okay.

6           MR. LÓPEZ:  I'm sorry, Your Honor.

7    BY MR. LÓPEZ:

8    Q.    So, your testimony here is that, as of today, your son

9    has been wearing the bracelet for three years and a half, more

10   or less?

11   A.    But...

12          MR. VÁZQUEZ:  Your Honor, I...

13          MR. LÓPEZ:  As of today.

14          THE COURT:  But, he's at MDC. How is going to be

15   wearing the...

16          MR. VÁZQUEZ:  Exactly.

17          THE COURT:  ... electronic monitoring device?

18          MR. VÁZQUEZ:  I think we need to...

19          THE COURT:  I agree.

20          MR. VÁZQUEZ:  ... I guess... restrict ourselves to

21   the time and space with regards to October 9, 2012, to that

22   time, for how much time he was wearing it.

23          THE COURT:  I agree.

24          MR. LÓPEZ:  Okay, Your Honor, she testified that he

25   had been wearing the bracelet for at least three years. So,

1  we'll take that as good.

2          THE COURT:   Okay.

3  BY MR. LÓPEZ:

4  Q.     At least three years, right?

5  A.     Yes.

6  Q.     Okay, and, during those three years, he had always been

7  in a lock-down condition?

8  A.     Yes, he has to be at the home.

9  Q.     And, that entails that he had to be at the home, at the

10  residence?

11  A.     Yes.

12  Q.     Because, if he goes out to the perimeter... and you tell

13  me if this is correct... it will... the bracelet will alert

14  that he's out on the perimeter?

15  A.     Yes.

16  Q.     And, you know this because? Why do you know this?

17  A.     Because the Social Worker told me.

18  Q.     And, the truth is that your son has been giving alerts,

19  many alerts, throughout the whole three years, right?

20  A.     **NO AUDIBLE RESPONSE FROM WITNESS.**

21  Q.     Is that the truth?

22  A.     No.

23  Q.     "Yes" or "no"?

24  A.     No.

25  Q.     No?

1  A.    No, because the Social Worker has not called me. If it
2  gives a lot of alerts, he would call me.
3  Q.    So, your testimony here today, under oath, is that your
4  son has never... the system has never alerted in terms that
5  he's out of the perimeter, right?
6  A.    Can you repeat?
7  Q.    In your testimony, you're saying that you never have
8  been advised that the system has alerted in terms that your
9  son is out of the perimeter?
10 A.    You mean the machine?
11 Q.    Yes.
12 A.    Well, if he goes out, the machine is going sound off.
13 Q.    I know that, ma'am. However, I'm asking you if you ever
14 have been advised, by the Social Worker, that your son's
15 bracelet had alerted because he's out of the perimeter?
16 A.    You mean the Social Worker?
17 Q.    Yes.
18 A.    No, not to me.
19 Q.    He has never... okay. So, as far as you know, the
20 system, during the whole... these whole three years, has never
21 alerted because he's out of the perimeter, "yes" or "no"?
22 A.    I don't recall.
23 Q.    You don't remember, of course.
24        Ma'am, has your son ever been arrested before
25 because the system... at the State level... because he system

1   alerted that he was out of the perimeter? Do you know about

2   this?

3          MR. VÁZQUEZ:   Objection as to the form of the

4   question. The word "arrest", with regards to violation of

5   conditional release, is not the correct term. It would be

6   whether or not he had been detained.

7          MR. LÓPEZ:   Well, I'll rephrase.

8   BY MR. LÓPEZ:

9   Q.    Has been detained before, by the Social Worker of the

10  State level, because the system alerted that he's out of the

11  perimeter?

12  A.    You mean the Social Worker?

13  Q.    Yes.

14  A.    No.

15  Q.    No, he has never been detained?

16  A.    Well, you mean ever since he has the monitor?

17  Q.    Because he alerted because he's out of the perimeter,

18  for that reason only?

19  A.    No, if they had taken him out of my house. If the

20  question was if the Social Worker removed him from my house

21  because of the alert given, the answer is no.

22  Q.    Okay, so he has never been detained or arrested because

23  the system alerted that he's out of the perimeter? During

24  those three years, he had never been detained because of that?

25  A.    No.

1    MR. LÓPEZ:   Okay, Your Honor, we would like to mark

2   this as I.D. ... Government I.D. 1, an aerial picture.

3         THE COURT:   Yes.

4    MR. LÓPEZ:   Permission to approach the Witness,

5   Your Honor.

6         THE COURT:   Yes.

7   BY MR. LÓPEZ:

8   Q.    Okay, Ms. Batista, your testimony here is that you have

9   been living there, in the Apiadero Ward, for thirty years,

10   right?

11   A.    Yes.

12   Q.    And, you know the area very well?

13   A.    Well, where I live, I do.

14   Q.    What is that that I just handed to you, what has been

15   marked as I.D. 1 for the Government?

16   A.    A photograph.

17   Q.    Okay, do you recognize that photograph?

18   A.    **NO AUDIBLE RESPONSE FROM WITNESS.**

19   Q.    Do you know the area that is depicted in that picture?

20   A.    I can't make it out clearly.

21   Q.    Is that the Apiadero Ward?

22   A.    It's just that...

23         MR. VÁZQUEZ:   Judge, may we approach on this?

24         THE COURT:   Yes.

25   **(INAUDIBLE BENCH CONFERENCE.)**

1          THE COURT:  The question was if that was Apiadero

2     Ward, correct?

3          MR. LÓPEZ:  Yes.

4     A.   I don't know. I'm unable to identify well here.

5     BY MR. LÓPEZ:

6     Q.    You don't recognize it?

7     A.   Not in this picture.

8     Q.   Okay, ma'am, you mentioned that, on October 9, 2012,

9     around 11:45 A.M., your son was at your house.

10    A.   Yes.

11    Q.   And, you also mentioned that you worked that day, right?

12    A.   Yes.

13    Q.   Where do you work?

14    A.   Well, at Apiadero Ward, further up, about half an hour

15    away from my house. I work at an elderly woman's home.

16    Q.   Okay, and when do you start your shift there?

17    A.   From eight in the morning.

18    Q.   And, how many hours do you work?

19    A.   Three.

20    Q.   Three hours?

21    A.   Yes.

22    Q.   Okay, and how many hours do you work in a week?

23    A.   **NO AUDIBLE RESPONSE FROM WITNESS.**

24    Q.   Are you a full-time employee there?

25    A.   Five days a week, Monday to Friday.

1  Q.    Are you a full-time employee there?

2  A.    No.

3  Q.    Okay, how many hours do you work then in a week?

4  A.     Fifteen.

5  Q.    Fifteen hours?

6  A.    Yes, weekly.

7  Q.    So, at what time do you get out of work?

8  A.    Well, it all depends. Sometimes I get out at eleven,

9  eleven, thirty.

10  Q.    Okay, and, after that, your testimony is that you

11  went... when you get out of work, you go to your grandmother's

12  house?

13  A.    Yes.

14  Q.    Okay, and you went to your grandmother's house on that

15  day?

16  A.    Yes, I go in every, single day.

17  Q.     Okay, and until what time were you there?

18  A.     Well, sometimes I'm there about an hour because, when I

19  come down, I always help my mother if one has to bathe her,

20  for instance.

21  Q.     Okay, so, if you get out of work at eleven, eleven,

22  thirty, and you go to your grandmother's house to take care of

23  her, you stay there for, more or less, like an hour, right?

24  A.    Yes.

25  Q.    So, you would be back at home like, more or less, at

1 noon or at 1:00 P.M.?

2 A.     About twelve.

3 Q.     Twelve, okay. But, your testimony here was that, at

4 eleven, forty-five, your son was at hour house, right, "yes"

5 or "no"?

6 A.     Yes, he has to be there.

7 Q.   Oh, he has to be there. But, you don't know, for a fact,

8 that he was there because the truth is that you weren't there.

9 You were at your grandmother's.

10          MS. RÍOS-FUENTES:   Your Honor, we have an

11 objection.

12 BY MR. LÓPEZ:

13 Q.     "Yes" or "no"?

14          MS. RÍOS-FUENTES:   He's making questions one on top

15 of the other.

16          THE COURT:   I agree, I agree. We have to... first

17 of all, we have to establish that we're talking about October

18 9th. Correct?

19          MR. LÓPEZ:   Yes.

20          THE COURT:   Okay, let's go step by step.

21 BY MR. LÓPEZ:

22 Q.     Okay, ma'am, the truth is that, on October 9, 2012,

23 you weren't... at 11:45 A.M., you weren't at your house, "yes"

24 or "no"?

25          THE COURT:   Who, she?

1          MR. LÓPEZ:   Yes, she.

2          THE COURT:   Okay.

3  A.    No, because I always go in to see my grandmother.

4  BY MR. LÓPEZ:

5  Q.    Of course. And, you stay there for an hour?

6  A.    Yes.

7  Q.    Of course. So, the truth is that you don't know, for a

8  fact, that your son was at the residence at eleven, forty-

9  five, "yes" or "no"?

10 A.    I believe he was.

11 Q.    You believe, but you don't know?

12 A.    Yes, I believe he's at the house.

13         MR. LÓPEZ:   Okay, permission to approach, Your

14 Honor?

15         THE COURT:   Yes.

16 BY MR. LÓPEZ:

17 Q.    Ma'am, I'm showing you what has been pre-marked as

18 Government I.D. 2. What is that that I'm showing to you?

19                         PAUSE

20         (Revision of photograph by Witness.)

21 A.    A four-track.

22 BY MR. LÓPEZ:

23 Q.    Do you recognize that four-track or ATV?

24 A.    **NO AUDIBLE RESPONSE FROM WITNESS.**

25         MR. LÓPEZ:   I'm going to rephrase the question,

1  Your Honor.

2           THE COURT:   Okay.

3  BY MR. LÓPEZ:

4  Q.    Have you seen that ATV before?

5  A.    No.

6  Q.    This is the first time that you see that ATV?

7  A.    Yes.

8  Q.    Okay, do you recognize the house that is depicted in

9  that picture, behind the ATV?

10 A.    My house is back here.

11 Q.    Ma'am, the house that is depicted in that picture, do

12 you recognize it?

13 A.    You mean this other one?

14 Q.    Yes.

15 A.    This is my grandmother's.

16 Q.    Your grandmother's?

17 A.    Luis' grandmother's.

18 Q.    And, how far is Luis' grandmother's house from your

19 house, your residence?

20 A.    I don't know.

21 Q.    You don't know?

22 A.    Not the distance from there to there.

23 Q.    Approximately... walking, it's approximately ten,

24 fifteen minutes away, half an hour?

25 A.    No.

1  Q.     Then?

2  A.     About five minutes.

3  Q.     Walking distance?

4  A.     Uh huh, from here to here.

5  Q.     So, that house is five minutes away from your

6  residence, right?

7  A.     You mean this one?

8  Q.     Yes, the one in the picture.

9  A.     Yes, yes.

10 Q.     And, you do recognize that that is Luis' grandmother's

11 house, and that's the area near your residence, right?

12 A.     Yes.

13         MR. LÓPEZ:   Your Honor, we will move Government

14 I.D. 2 to be...

15                          PAUSE

16                    (**"SYSTEM FAILED"**,

17          **AS TRANSCRIBED IN OFFICIAL COURT LOG**

18            **OF ABOVE-CAPTIONED PROCEEDING.**)

19         MR. LÓPEZ:   We're back? May I proceed, Your Honor?

20         THE COURT:   Yes.

21 BY MR. LÓPEZ:

22 Q.     So, I'm going to pose the question again, ma'am.

23         Your testimony here is that your residence is five

24 minutes away from Luis' grandmother's house, right?

25 A.     Yes.

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1  Q.    On foot?

2  A.    Yes.

3          MR. LÓPEZ:   I don't have no more questions, Your

4  Honor.

5          THE COURT:   Any Redirect?

6          MS. RÍOS-FUENTES:   Yes, Your Honor.

7                    **REDIRECT EXAMINATION**

8  BY MS. RIOS-FUENTES:

9  Q.    Ms. Batista, you told Brother Counsel that you... when

10 you get out of work, you always stop by your grandmother's

11 house.

12 A.    Yes.

13 Q.    Your grandmother's house is right next to your house?

14          MR. LÓPEZ:   Your Honor, objection, leading.

15          THE COURT:   Sustained. Stricken, the answer and the

16 question.

17 BY MS. RIOS-FUENTES:

18 Q.    How far is your house from your grandmother's house?

19 A.    It's small distance. It's right behind. It's right

20 adjacent.

21 Q.    Would you... at that distance, you could see... are you

22 able to see your house from your grandmother's house?

23 A.    Well, if I'm in the back area, yes.

24 Q.    How many entrances and exits does your house have?

25 A.    One.

1 Q. And, where does that exist lead to?

2 A. You mean my house?

3 Q. Yes.

4 A. The one in front, the door in the front of the house.

5 It's door to door to my grandmother's.

6 Q. On the 8th... on the 9th of October, when you were in

7 your... you were... you went to your grandmother's house, as

8 you testified to Brother Counsel.

9 A. Yes.

10 Q. Would you... did you hear any alarm go off regarding

11 his...

12       MR. LÓPEZ: Objection, Your Honor, leading.

13       THE COURT: Sustained.

14 BY MS. RIOS-FUENTES:

15 Q. What is... you told Brother Counsel that he had never

16 been arrested for violation of the conditions of the

17 electronic monitoring device.

18 A. No.

19 Q. To the best of your knowledge, he had never been

20 arrested? That's what you told Brother Counsel.

21 A. For the bracelet, no.

22 Q. Okay, did you... how would you know if the electronic

23 monitoring device would sound an alert?

24 A. If he goes out to a distance, that sounds off.

25 Q. How do you know that?

1    A.    Because it's a loud sound.

2    Q.    And, how do you know it's a loud sound?

3    A.    Because the times we go to the Court, my mother tells me

4 that the machine sounds off to a limit, and then the little

5 lightbulb stays at a stop.

6    Q.    You said you work three hours a day, five days a week.

7    A.    Yes.

8    Q.    Who do you work for?

9    A.    The Villalba Municipality.

10    Q.    What kind of work do you do?

11    A.    Housekeeper.

12    Q.    You said that... when Brother Counsel showed you the

13 picture, you stated that you didn't recognize the yellow four-

14 track. Is that correct?

15    A.    No.

16    Q.    Does Luis Guzmán have a four-track?

17    A.    He has a four-track, yes.

18    Q.    Is the one depicted in the picture his four-track?

19    A.    No.

20    Q.    On the 9th of October...

21       MS. RÍOS-FUENTES:    Let me rephrase the question,

22 Your Honor.

23 BY MS. RIOS-FUENTES:

24    Q.    Have you seen... have you heard this four-track

25 operated, Luis' four-track?

1  A.    The one that is stored away? It's stored.

2  Q.    Had you previously heard it operated? Have you seen it

3  operated?

4  A.    You know, if he takes it out of the place?

5  Q.    My question is not directed at Luis. I'm just asking

6  you if you had seen it? Does it work?

7  A.    You mean the four-track?

8  Q.    Yes.

9  A.    Yes.

10 Q.    Have you seen it operated?

11 A.    Right now, it's stored. It's... we have it stored.

12 Q.    And, previously?

13 A.    No, no.

14        MS. RÍOS-FUENTES:   No further questions, Your

15 Honor.

16        THE COURT:  Any Re-Cross?

17        MR. LÓPEZ:  No, Your Honor.

18        THE COURT:  You're excused, ma'am. Thank you.

19             (Witness is excused.)

20        THE COURT:  Let's take a ten minute break. Who will

21 be the next witness?

22        MS. RÍOS-FUENTES:  Your Honor, we... as we informed

23 you, we subpoenaed Ms. Yashira Silva for nine o'clock in the

24 morning. We don't know if she's here or not.

25        MR. LÓPEZ:  Yes, we have been informed that she's

1  on the seventh floor.

2         THE COURT:  Okay, so she will be the next witness?

3         MS. RÍOS-FUENTES:   Yes, Your Honor.

4         THE COURT:   Okay, let's take a ten minute break.

5                (Off the record.)

6                 (Brief recess.)

7               (Back on the record.)

8         THE COURT:   Yes.

9         MS. RÍOS-FUENTES:   We call Ms. Yashira Silva, Your

10 Honor.

11         THE COURT:   Let's take the oath.

12         COURTROOM DEPUTY:   Raise your right hand. Do you

13 swear that all the testimony you're about to give in the case

14 now before the Court is the truth, the whole truth, and

15 nothing but the truth, so help you God?

16         WITNESS:   I do.

17         COURTROOM DEPUTY:   Thank you. Be seated.

18      (Whereupon,

19                **MS. YASHIRA SILVA-GONZÁLEZ**

20 after having been first duly sworn, was examined and, through

21 the Official Court Interpreter, testified upon her oath as

22 follows:)

23                **DIRECT EXAMINATION**

24 BY MS. RIÓS-FUENTES:

25 Q.   Good morning.

1  A.    Good morning.

2  Q.    Please state your name for the record, please?

3  A.    Yashira Silva-González.

4  Q.    Ms. Silva, where do you work?

5  A.    At the Specialized Unit of Investigations and Arrests of

6  the Pre-Trial Services Office.

7  Q.    What are your duties in that office?

8  A.    I am the Supervisor of the Unit.

9  Q.    And, what exactly does the unit do?

10  A.    We supervise people charged with crimes, some them

11  through monitoring devices, and others through sporadic

12  contact.

13  Q.    Do you know Mr. Luis Guzmán-Batista?

14  A.    He is a person who was supervised by the office.

15  Q.    What kind of supervision was he under?

16  A.    A radio frequency system.

17  Q.    What exactly does that mean?

18  A.    It's a device placed at the residence of the person that

19  is accused. It is placed on the telephone line. He has a

20  bracelet which monitors the entrances and exits within a

21  perimeter established at the house.

22  Q.    On October 9, 2012, did he have one of these monitoring

23  devices you are telling us about?

24  A.    Yes.

25  Q.    What alert, if any, did Mr. Guzmán-Batista... did you

1  receive... what alert, if any, did you receive, on October 9th,

2  regarding Mr. Guzmán-Batista, of 2012?

3  A.     You mean an alert? What type of alert?

4  Q.     If any, did you receive, on October 9, 2012.

5  A.     No, no alert.

6         MS. RÍOS-FUENTES:   No further questions, Your

7  Honor.

8         THE COURT:   Cross.

9                    **CROSS EXAMINATION**

10  BY MS. SOTO:

11  Q.    Good morning, Ms. Silva. To the questions of the

12  Defendant's legal Counsel, you said that you're a Supervisor

13  from OSAC.

14  A.     Yes, of the Arrest Unit of OSAC.

15  Q.    Since how long have you been as a Supervisor there?

16  A.     Since the month of July.

17         THE COURT:   Of what year?

18  A.    2012.

19  BY MS. SOTO:

20  Q.    And, you mentioned before that, as part of your duties,

21  what you do is supervise the Defendants that wear the

22  electronic monitoring devices, right?

23         MS. RÍOS-FUENTES:   Objection, Your Honor. She's

24  leading.

25         THE COURT:   She's in Cross. She can lead whatever

1  she wants.

2  A.     Yes.

3  BY MS. SOTO:

4  Q.     Okay, and that that system works as a radio frequency

5  system, right?

6  A.     Yes.

7  Q.     Okay, and can you explain, in more detail, what is...

8  what you refer as a "radio frequency system"? How does that

9  work?

10  A.     Well, as soon as we proceed to receive the report of

11  installation, and agent in the field is assigned, and he goes

12  on to show up at the house and install.

13          He places the radio frequency unit, the receiving

14  unit. That is placed on the telephone. He placed, on the

15  Defendant, the device, the electronic bracelet.

16          Perimeter tests are performed, and we proceed to

17  give an orientation regarding the conditions posed by the

18  Court of Instance.

19  Q.     And, when you refer to a "perimeter", what do you

20  refer... I'm sorry... when you said "perimeter", that is...

21  what is the perimeter that it's covering there?

22  A.     You mean the case at bar?

23  Q.     Yes, as for Luis Guzmán-Batista, if you know.

24  A.     What the record shows or the file shows is that he had

25  a medium perimeter.

1  Q.    And, a medium perimeter means how much distance?

2  A.    It can include between seventy-five and a hundred and

3  fifty feet.

4  Q.    But, that's a radio, right?

5  A.    Yes.

6  Q.    Okay, it's not like a distance from... like a line?

7  A.    No.

8  Q.    Okay, you mentioned before that, on October 9, 2012, as

9  far as you know, Luis Guzmán-Batista was wearing a device.

10 A.    That is correct.

11 Q.    And, that that day, there was no alert?

12 A.    No.

13 Q.    Okay, and what do you refer as "no alert"?

14 A.    We have established protocols, and we become

15 knowledgeable if there is... if the Defendant...

16         INTERPRETER:    *Perdoname. Es que me fui en blanco.*

17         THE COURT:    You have... let's... I'm going to go in

18 Spanish. *Cuando Usted está contestando, vaya poco a poco, de*

19 *manera que la Interprete pueda ir traduciendo.*

20         INTERPRETER:    *Okey, gracias.* Thank you, Your Honor.

21 A.    We are aware that there are some protocols. These

22 protocols establish the alerts that we're going to take under

23 consideration in the cases.

24         In the case of Luis Guzmán, he did not have an

25 established schedule where he could go out. He was restricted

1  twenty-four/seven, in addition to the other alerts that are

2  generally established upon all the Defendants.

3  BY MS. SOTO:

4  Q.    And, when you say he was "restricted twenty-four/seven",

5  that means that he had to be in his house?

6  A.    Yes.

7  Q.    Okay, as part of your duties, you are the one who

8  custodied (sic) Luis Guzmán's records, right?

9  A.    Yes.

10 Q.    Okay, and, before October 9, 2012, had you received any

11 alerts that he did not comply with the conditions that were

12 set for him?

13         MR. VÁZQUEZ:    Objection, prevalence (phonetic),

14 before October 9, 2012.

15         THE COURT:    Sustained.

16         MR. LÓPEZ:    Your Honor, may we approach?

17         THE COURT:    Yes.

18 **(INAUDIBLE BENCH CONFERENCE.)**

19         THE COURT:    Sustained.

20 BY MS. SOTO:

21 Q.    Ms. Silva, what happens if a person goes out the

22 perimeter that is set for him?

23 A.    An alert goes off. If the person goes out of the

24 perimeter that is established, and is not within the grace

25 period, it sounds an alert of an exit.

1  Q.    Okay, so you're mentioning that, if he goes out from the

2  grace period, that would... what is the grace period here, in

3  this case, for Luis Guzmán-Batista, if you know?

4  A.    Six minutes.

5  Q.    Okay, so the alert would come out after six minutes? I

6  mean, once he goes out of the perimeter for the seventy (sic)

7  feet toward the hundred feet... you said... you mentioned

8  before that it was from seventy-five feet to one hundred and

9  fifty feet, right?

10 A.    Yes, approximately.

11 Q.    So, an alert would come if he passes those feet, and

12 then after six minutes, right?

13 A.    That is correct.

14 Q.    Okay, so what happens if the Defendant or the person who

15 wears the electronic monitoring device goes out and comes in

16 during those six minutes?

17 A.    Nothing.

18 Q.    So, no alert would come out?

19 A.    No, no alert is going to come out.

20 Q.    Why?

21 A.    No alert is going to come out because the grace period

22 is utilized, and it utilizes what the perimeter would be, and

23 that would give more time, a longer period of time.

24 Q.    And, when you say a "longer period of time", for what?

25         THE COURT:    I...

1  BY MS. SOTO:

2  Q.    Explain it to the Judge.

3        THE COURT:    I got lost on that answer. She was

4  explaining that that would give more time. I'm lost.

5  BY MS. SOTO:

6  Q.    Can you explain, to the Magistrate Judge, how those six

7  minutes of grace work?

8  A.    When the installation of the electronic surveillance or

9  supervision system takes place, the systems bring with them a

10 grace period.

11        The installing agents, depending on the scenario of

12 the residence and the cases that are charged, and also if it

13 has like the schedule provided by the Court, they proceed to

14 provide grace periods.

15 Q.    Okay, but how do the grace periods work?

16 A.     Usually, grace periods are for like, for instance, when

17 Defendants have like schedules, so that you don't increase a

18 certain degree of alert within the monitoring.

19        Now, many grace periods are provided so that not

20 very many alerts are given, that he did not come back to the

21 regular... to what is previously established.

22 Q.    And, in particular in this case, for Luis Guzmán-

23 Batista, how does that grace period work?

24 A.    Well, the grace period works when a schedule is

25 performed so that he can come out to is appointments at Court,

1  to his hearings.

2          And, to that effect, I understand that it could have

3  been a prerogative of the installing agent to provide that

4  grace period that was established.

5  Q.    But, then an alert would come out after those six

6  minutes, right, that he had?

7  A.    Yes.

8  Q.    Okay, you just mentioned before... what happens if, for

9  example, Luis Guzmán-Batista goes out after those six minutes?

10 A.    An alert will come on.

11 Q.    Okay, but can you explain... and, if he comes back

12 during those six minutes, what would happen?

13 A.    It does not provide an alert.

14 Q.    Okay, and why? Can you explain?

15 A.    Of course. It is covered by the established perimeter

16 and the grace period that establishes it.

17         Well, if he goes out to the area that is covered by

18 the radio frequency that is seventy-five feet to a hundred and

19 fifty feet, and he steps... you know... carries out anything

20 outside that perimeter, that lasts longer than those six

21 minutes, it would not give an alert.

22 Q.    Okay, and, when you say it would not give any alert,

23 what does... what will appear in the system that you have been

24 monitoring Luis Guzmán-Batista?

25 A.    A "hello" (sic).

1  Q.    Okay, but that "hello" means what?

2  A.    That the receiving unit carried out a communication, and

3  that the same didn't have any interruption, and it was

4  perfect, and that there was no alert during that period of

5  time.

6  Q.    Okay, and, in terms of perimeter, when does the six

7  minutes start counting?

8  A.    When it stops covering the perimeter.

9  Q.    And, that means when he's outside the seventy (sic) feet

10 to one hundred and fifty feet?

11 A.    That is correct.

12 Q.    At that point will start the six minutes of grace that

13 he has?

14 A.    That is correct.

15 Q.    Are you aware if the Defendant knows about this six

16 minute period of grace that he has?

17         MR. VÁZQUEZ:   Objection, calls for speculation

18 (phonetic).

19 A.    Well, he's not supposed to. But, what happens is that...

20         MR. VÁZQUEZ:   Objection, unresponsive. She answered

21 the question.

22 BY MS. SOTO:

23 Q.    Please explain?

24         THE COURT:   "He is not supposed to, but...". I will

25 allow it. Otherwise, I will ask the question. So...

1  A.    What happens is that, when these people are supervised

2  by these electronic monitoring devices...

3         MR. VÁZQUEZ:   Objection, Your Honor.

4         THE COURT:   Please approach, please approach.

5  **(INAUDIBLE BENCH CONFERENCE.)**

6  BY MS. SOTO:

7  Q.    Okay, the question is, as to this Defendant, do you know

8  or are you aware if he knew that he had a six period of grace?

9  A.    I assume not.

10 Q.    Okay, and why are you assuming that or you believe so?

11        MR. VÁZQUEZ:   Objection, relevance (phonetic).

12        THE COURT:   Sustained, and it would call for

13 speculation as well.

14 BY MS. SOTO:

15 Q.    As to this Defendant, as to Luis Guzmán-Batista, have

16 you received any information, or from your documents that you

17 custody (sic), if you know he had given any alert as to the

18 six minute grace period (phonetic)?

19 A.    What the record shows or the file shows the alert that

20 he incurred in was a manipulation.

21 Q.    Okay, and what do you mean by "manipulation"?

22 A.    It's one of the protocols established in the alert...

23 well... the Defendant removes, from the system, from the

24 receiving unit, the telephone and the electricity.

25        It gives us that alert that we understand that he's

1  taken away the receiving unit, given the fact that there was

2  no separation between the bracelet and the receiving unit.

3  Q.    And, so he alerted before... there was an alert before

4  that he was not using the system as it was supposed, right?

5  A.    Not one, but many.

6  Q.    How many?

7  A.    If you allow me to look.

8  Q.    You're referring right now to your documents?

9  A.    Yes.

10                          PAUSE

11              (Revision of documents by Witness.)

12  A.    From the file that I'm able to see, he has several other

13  alerts of periods outside the established perimeter, on

14  different dates.

15  BY MS. SOTO:

16  Q.    But, how many were there, if you can count them?

17  A.    It's going to take me a little while.

18  Q.    Okay.

19          THE COURT:   Would Counsel please approach.

20  **(INAUDIBLE BENCH CONFERENCE.)**

21                          PAUSE

22          (Continued revision of documents by Witness.)

23  BY MS. SOTO:

24  Q.    Yes?

25  A.    From what I was able to see in the file, as quickly as I

1  tried to do so, he has twenty-three alerts, within the period

2  that he had the electronic supervision, whereby he got out of

3  the perimeter without an established schedule.

4  Q.    But, when you say you're referring to the document that

5  you have in your hand, those dates cover when to when?

6  A.    From December 1, 2011 to October 16, 2012.

7  Q.    And, the Defendant, he was informed that he was not

8  complying or that he gave any alert? He was informed about

9  that? Sorry.

10 A.    On countless occasions. He was oriented by phone, and,

11 in addition, we filed Motions to the Court indicating that he

12 did not comply with the established conditions, not only with

13 the electronic monitoring, but also with other situations that

14 took place within the monitoring, upon being active in the use

15 of controlled substances.

16 Q.    And, during that time that he was supervised by your

17 office, he was arrested?

18 A.    Yes.

19 Q.    And, why?

20 A.    Well, I understand he was arrested in the town of

21 Orocovis while he was transporting himself in a four-track,

22 and he had, in his possession, controlled substances.

23 Q.    What date was that, if you recall?

24 A.    This record doesn't show... this file doesn't show the

25 complaints in that case in specific.

1  Q.     But, it was within the period that you were supervising

2  Luis Guzmán-Batista, right?

3  A.     Yes.

4           MS. SOTO:    Okay, no further questions, Your Honor.

5           THE COURT:    Redirect?

6           MS. RÍOS-FUENTES:    Yes, Your Honor.

7                        **REDIRECT EXAMINATION**

8  BY MS. RIOS-FUENTES:

9  Q.     Ms. Silva, you told Sister Counsel that, when you set up

10  the equipment in Mr. Guzmán's house, the person who sets up

11  the equipment sets up the perimeter. Is that correct?

12  A.     Every residence is different. It's not the same thing

13  when I install it in a residence in reenforced concrete or in

14  a residence that has been recently contracted, which is not

15  the same quality as compared to one built before or an

16  apartment, a studio, or a wooden house.

17           It all depends on the experience that the installing

18  agent has, who proceeds then to comply with the instructions

19  of the Court that the domicile or the home detention is within

20  twenty-four/seven inside the home... the residence (phonetic).

21           Tests are performed in areas inside the residence

22  where there could be problems, like, for instance, in the

23  bathroom, the distant areas, like, for instance, the family

24  room.

25           Meanwhile, the restriction that is established is

1  that it's home detention at his residence. The established

2  perimeters is something that the system, itself, has.

3  Q.    To establish a medium, large or small perimeter, you

4  take into account the size of the house?

5  A.    Of course.

6  Q.    In a small house, the perimeter would be smaller?

7  A.    It's supposed to be. It's understood as so. It all

8  depends.

9  Q.    Are you familiar with Mr. Guzmán's house?

10  A.    No, I never visited it.

11  Q.    In your file, in Mr. Guzmán's file, can you... is there

12  any mention about the size of this house?

13  A.    No.

14  Q.    Do you know if this is a big house or a small house?

15  A.    That is discussed usually between the installing agent

16  that provides you the information of how the installation took

17  place, and he comments this to you.

18  Q.    In Mr. Guzmán's house... in Mr. Guzmán's case, what did

19  the person who installed the equipment tell you?

20  A.    Well, as a matter of fact, it was installed... this

21  equipment was reinstalled after he was arrested. There was no

22  information in the record because I didn't have any

23  communication with the installing agent.

24      And, it came out because of the cases that he had

25  for controlled substances.

1   Q.    But, do you know the size of that house?

2   A.    No.

3   Q.    No. And, Ms. Silva, how do you know then what the

4 perimeter is in this house?

5   A.    I never said I knew what the perimeter was.

6   Q.    So, when you mentioned a perimeter to Sister Counsel, it

7 wasn't referring to Mr. Guzmán's house?

8   A.    Well, I believe there's a confusion with regards to what

9 I say the perimeter is.

10   Q.    When you mentioned the seventy-five to a hundred and

11 fifty feel, were you referring to Mr. Guzmán's case or not?

12   A.    To the perimeter of the receiving unit, not to the

13 perimeter of his residence.

14   Q.    So, that would be the amount of feet he would be allowed

15 from the receiving unit, to walk away from the receiving unit?

16   A.    He's not allowed to walk. It's the perimeter that the

17 receiving unit has in a house that he may have.

18         The unit provides a perimeter capacity for those

19 different houses that can be available in Puerto Rico. What

20 happens in these cases is that all Defendants have a capacity

21 of perimeter that is lesser or greater.

22         In this specific case, it's the one that the

23 installing agent believed or deemed that it merited, according

24 to his residence. I don't know the capacity and measurements

25 of the residence of every Defendant.

1  Q.    So, you cannot tell the Court what was the perimeter

2  specifically for Mr. Guzmán?

3  A.    I cannot say so because I never visited it.

4  Q.    And, can you tell the Court how far he could walk

5  outside his house, if any, before giving an alert?

6  A.    It depends on the residence, and where the receiving

7  unit has been installed.

8  Q.    In this specific case, would you be able to tell the

9  Court that?

10  A.    From the follow-up performed by the agents of the Ponce

11  area, we knew that he had a pretty broad perimeter for the

12  residence that he had, that he was residing in.

13       Because, as I was told, it was wooden residence.

14  And, one of the agents, Agent Luis Aponte, did tell us, on one

15  occasion, that he got to the house, and he was in a residence

16  in front of his, which he identified as the residence of his

17  grandmother.

18  Q.    Did Agent Aponte tell you if this house was small?

19  A.    Which house?

20  Q.    Luis' house.

21  A.    I understand that, at a given time, he must have told me

22  so.

23  Q.    But, you say that... you told Sister Counsel that all

24  Defendants have grace periods.

25  A.    All those supervised through electronic bracelets should

1 have a grace period, and it's extended according to the

2 established schedules. Some cases are limited, depending on

3 the sensibility of the same.

4 Q.    So, a person who works, for example, has a bigger grace

5 period than a person who is in lock-down. Is that correct?

6 A.    It's possible, but not necessarily though.

7 Q.    So, the grace period is determined according to the

8 conditions of the Court, and the case for which the person is

9 under the supervision?

10 A.    It should be established according to the crimes that

11 have been charged, and the experience of the person that

12 performs the installation.

13 Q.    What were the cases for which Mr. Guzmán-Batista was

14 under supervision?

15 A.    A murder.

16 Q.    So, a person under Indictment of murder would get six

17 minutes of grace?

18 A.    Or less.

19 Q.    And, you mentioned, to Sister Counsel, about a

20 manipulation of the equipment.

21 A.    Yes.

22 Q.    That would give a certain type of alert?

23 A.    That is correct.

24 Q.    Which would... I am asking that would be a different

25 kind of alert than the regular alert of leaving the perimeter?

1  A.   That is correct.

2  Q.   On October 9th, was there any kind of manipulation alert?

3  A.   No.

4  Q.   You mentioned that... to Sister Counsel, you mentioned

5  that Mr. Guzmán-Batista was arrested in Orocovis.

6  A.   Yes.

7  Q.   Who performed this arrest?

8  A.   The Puerto Rico Police.

9  Q.   Did OSAC, at any time, arrest Mr. Guzmán?

10 A.   Yes.

11 Q.   When?

12 A.   I don't know the date, but there is an Order for the

13 arrest from the Pre-Trial Services Office, and served by Agent

14 José Maldonado (phonetic).

15 Q.   Do you know what year this was?

16 A.   No.

17 Q.   Is it in your file?

18 A.   No, not in mine.

19 Q.   So, the totality of Mr. Guzmán's file is not under your

20 custody?

21 A.   No.

22 Q.   So, is there more than one file regarding Mr. Guzmán?

23 A.   The Pre-Trial Services Office is made up of two areas.

24 One of them is Supervision and Follow-up, and the Specialized

25 Unit of Investigations and Arrests. I have the file of the

1  Investigations and Arrests Unit.

2          The original Center of Ponce Services, OSAC/Ponce,

3  the Social Worker has another file, which is the Social

4  Worker's file, which contains documents of a confidential

5  nature.

6  Q.   What about the Motions you mentioned that were filed in

7  State Court, are those in your file or in the other file?

8  A.    From my file, there is one of them, but, from

9  supervision, there must be several of them... Supervision and

10 Follow-up area. That one shows that it was filed on September

11 19, 2012.

12 Q.   September 19, 2012, that was the last one filed?

13 A.   Well, it's one of the ones that I have attached to the

14 file of the electronic supervision. But, there's a

15 possibility... and it must exist... all of them in the file of

16 Supervision and Follow-up.

17 Q.   After that last Motion was filed, that Motion you

18 mentioned on September 19th, did Mr. ... after September 19th,

19 did Mr. Guzmán have any indication of manipulation, according

20 to your supervision?

21 A.   **NO AUDIBLE RESPONSE FROM WITNESS.**

22          MS. SOTO:   I will rephrase, Your Honor. We're going

23 to withdraw the question and rephrase it.

24          THE COURT:   Okay.

25 BY MS. SOTO:

1  Q.    Did he... did Mr. Guzmán, after September 19, 2012, when

2  the Motion was filed, have an alert?

3  A.    It was the last day he had given an alert. He had an

4  exit at ten, twenty-eight in the morning, returning at ten,

5  thirty-six. He was the last alert that he gave.

6  Q.    On the day that the Motion was filed by OSAC?

7  A.    Uh huh, yes.

8  Q.    What would a five minute and fifty-nine second exit from

9  the perimeter reflect on the document? Would it reflect

10 anything?

11 A.    No.

12 Q.    But, if he came out of the perimeter for six minutes and

13 one second, it would reflect?

14 A.    Yes.

15 Q.    So, the system was working?

16 A.    In some alerts that were issued, yes.

17        MS. SOTO:   No further questions, Your Honor.

18        MR. LÓPEZ:   Your Honor, just... there's no

19 question. However, there is something that I want to clarify

20 in my notes with her testimony.

21        THE COURT:   Yes, I have a couple of questions.

22 BY MR. LÓPEZ:

23 Q.    You mentioned, Ms. Silva...

24        THE COURT:   I will allow Ms. Soto to conduct...

25        MR. LÓPEZ:   No, it's not a question. It's just to

1 clarify my notes in terms of her testimony.

2          THE COURT:   Okay, but the one who posed the... who

3 did the Cross was Ms. Soto. I will allow Ms. Soto.

4          MR. LÓPEZ:   Okay, I'm sorry.

5 BY MS. SOTO:

6 Q.   You mentioned before that there was an alert on

7 September 19, 2012. That was the day that the Motion was

8 filed, right?

9 A.   Yes.

10 Q.   Okay, but the alert, in terms of minutes, it was from

11 ten, twenty-eight to ten, thirty-six?

12 A.   Yes, that's correct.

13 Q.   So, that's eight minutes in total?

14 A.   Yes.

15          MS. SOTO:   No further questions, Your Honor.

16          THE COURT:   Ma'am, do you have any evidence on the

17 record that the system was working, on October 9, 2012, or not

18 working?

19 A.   Yes, it was working.

20          THE COURT:   Okay, you mentioned also that there are

21 two files. One which is kept for Supervision and Follow-up,

22 and the other one is for Investigations and Arrests.

23          The file related to any alerts and the monitoring

24 system is the one that you have there?

25 A.   Yes.

1        THE COURT:   So, the other file wouldn't have any

2   information in relation to alerts?

3   A.    Yes, it does.

4        THE COURT:   The same information or could it be

5   different information?

6   A.    When the alerts are followed in the monitoring center,

7   we send them, by fax, to the Regional Service Center so that

8   the Social Worker learns whatever steps were taken of the non-

9   compliance regarding the alert that had been worked on.

10        THE COURT:   So, it's the same information?

11   A.    It should be the same information.

12        THE COURT:   Okay, any follow-up questions from the

13   Government or Defense Counsel?

14        MR. LÓPEZ:   None from the Government, Your Honor.

15        MS. RÍOS-FUENTES:   Not from the Defense, Your

16   Honor.

17        THE COURT:   You're excused. Thank you.

18                  (Witness is excused.)

19        THE COURT:   Please approach.

20   **(INAUDIBLE BENCH CONFERENCE.)**

21        THE COURT:   We are going to take a lunch recess at

22   this time. We're resuming at one. Have a good lunch.

23                  (Off the record.)

24                  (Lunch recess.)

25              **A F T E R N O O N   S E S S I O N**

1                              (3:20 P.M.)

2                       (Back on the record.)

3            THE COURT:   Any further evidence on behalf of

4   Defendant?

5            MS. RÍOS-FUENTES:   At this time, none, Your Honor.

6            THE COURT:   Okay, from the Government?

7            MS. SOTO:   Yes, Your Honor. We're going to call...

8   request Witness PRPD Agent Héctor Rivera-Torres.

9            THE COURT:   Héctor?

10           MS. SOTO:   Rivera-Torres.

11           THE COURT:   Let's take the oath.

12           COURTROOM DEPUTY:   Raise your right hand. Do you

13  swear that all the testimony you're about to give in the case

14  now before the Court is the truth, the whole truth, and

15  nothing but the truth, so help you God?

16           WITNESS:   I do.

17           COURTROOM DEPUTY:   Thank you. Be seated.

18      (Whereupon,

19                **AGENT HÉCTOR L. RIVERA-TORRES**

20  after having been first duly sworn, was examined and, through

21  the Official Court Interpreter, testified upon his oath as

22  follows:)

23                      **DIRECT EXAMINATION**

24  BY MS. SOTO:

25  Q.   Good afternoon. Please state your name for the record?

1  A.    My name is Héctor L. Rivera-Torres.

2  Q.    And, what is your occupation, Mr. Rivera?

3  A.    I work for the Puerto Rico Police, at the Ponce Drugs

4  Division (phonetic).

5  Q.    And, how long have you been working with the Puerto Rico

6  Police Department?

7  A.    I've worked for the Puerto Rico Police since July 3,

8  1986.

9  Q.    And, to the Drugs Unit, in Ponce, how long have you been

10 working there?

11 A.    I've worked for the Ponce Drug Division since January

12 28, 1987.

13 Q.    Okay, and what are your duties as a PRPD Agent working

14 for the Drug Division?

15 A.    Presently, as an Investigating Agent, I am investigating

16 like Search Warrants, Searches and Seizures, and, as an

17 Investigating Agent, providing surveillance at the drug

18 points.

19 Q.    And, precisely, what have you done for this case in

20 particular?

21 A.    In this case, I performed some surveillances on the

22 8th... the 9th of October of last year, and I gave a Sworn

23 Statement, and I requested a Search and Seizure Order.

24 Q.    And, you just mentioned that you conducted a

25 surveillance on October 9, 2012 for this case.

1  A.    Yes, ma'am.

2  Q.    And, what did you observe on that day regarding the

3  Defendant in this case, just for the Defendant in this case?

4  A.     That day, I provided surveillance at the Los Pinos Ward

5  (phonetic), in Villalba. And, in this investigation, around

6  eleven, twenty-five in the morning, I was providing

7  surveillance at that community at #88.

8          And, like I said, approximately around that time, I

9  was able to observe that this individual, this young person

10 that is seated here, was in a yellow four-track.

11 Q.    Can you describe the person that you are saying that

12 you're looking at here, in Court?

13 A.     Well, a young, thin, tall individual, who I knew back

14 then by the name of Luis D. Guzmán-Batista.

15 Q.    And, you're observing that person here, in Court, today,

16 right?

17 A.    Yes, he's behind Counsel, and he's seated with the

18 uniform of the jail.

19         MS. SOTO:   Let the record reflect that the Witness

20 has identified the Defendant in this case.

21         THE COURT:   It shall so reflect.

22 BY MS. SOTO:

23 Q.    And, you said... you just mentioned that, while you were

24 conducting a surveillance, on October 9, 2012, you observed

25 the Defendant driving a yellow Banshee (phonetic), you said,

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1  right?

2       MS. RÍOS-FUENTES:   Your Honor, we have an

3  objection. She's misquoting the Witness, Your Honor. He said a

4  "yellow four-track".

5       THE COURT:   And, what did you say?

6       MS. SOTO:   Banshee.

7       MS. RÍOS-FUENTES:   That's the model.

8       THE COURT:   Well, let's use "four-track".

9       MS. SOTO:   Exactly.

10 **REPETITION, BY INTERPRETER, OF PREVIOUS QUESTION FOR BENEFIT**

11 **OF WITNESS.**

12 A.     Yes, ma'am.

13 BY MS. SOTO:

14 Q.    Okay, and what happened while you were observing this

15 person? You saw him, and what happened?

16 A.     That, while I was surveilling (sic) the residence of the

17 Los Pinos community, I saw when he arrived at this residence

18 in the four-track.

19       He parked in front of the residence. He was dressed

20 in a red sweater and long jeans. He got off of said four-

21 track, he entered the surveilled (sic) residence, and I lot

22 sight of him.

23       I continued my surveillance. And, around five

24 minutes elapsed, I was able to see when he came out, he got on

25 the four-track, he turned it on, he remained standing. He

1 turned it on because I heard that it's a type of four-track

2 that sounds loud, and it has a particular type of sound.

3 And, he remained standing, and I saw when he lifted

4 his sweater, he took out a pistol of a grey color, and he

5 placed it on his waist, but on the back side of his body.

6 He turned the four-track around, and he took off up

7 to the Apiadero Ward, and I decided to follow him. He arrived

8 to road of said ward, #562, and I proceeded on the same.

9 And, he proceeded towards the inside of said ward,

10 and I continued behind him, following him. So, when he entered

11 the first entrance to the left, and, when I also turned to the

12 left of that entrance, I observed that he had stopped on the

13 right-hand side of the road.

14 And, I also saw, prior to descending... because

15 that's like a little slope... you know... so that we can

16 understand each other... he got off of the four-track, and he

17 started to cross the street without looking towards my

18 vehicle.

19 When he entered on the right-hand side of a

20 residence, I took off. And, where he went in, I started to

21 pass by very slowly looking towards his direction, and I

22 observed he entered a wooden house of a tan color and white

23 windows.

24 I continued on, and I passed a little bridge that

25 there was at this place, and I turned my vehicle after the

bridge from where I maintained myself surveilling towards where he had entered, and taking the opportunity to write down the description of the house.

The house was a wooden house of a tan color, white windows. That's the only part that I saw from the front when I entered, and the two houses that are in-between an alleyway of which he entered.

If I look at both those houses, both are in cement. The one on the left has the trim with a blue color, and the one on the right has a trim of like a *terra cotta* color, with a grille or bars.

I waited at the place for about twenty minutes. I didn't see him coming out. I decided to move from the place. I went by this residence again, and I got to Road #562 (sic).

And, then I looked towards the residence, which is the only residence he could have gone into, and the same residence, on the side of the #562 Road, had Miami windows and a rusting roof.

Q.    How many surveillances, during your career, have you done in this ward, approximately?

A.    In that ward, that was the first one. That was the first one in that ward. Where he lived was the first one.

Q.    And, you're meaning which ward? Because you just said regarding two wards, Apiadero Ward or the Los Pinos Ward.

A.    Well, in the Apiadero Ward. That's where he lives. His

1  residence is there, in the Apiadero Ward. That's the first

2  time that I conducted a surveillance there.

3  Q.    And, in Los Pinos?

4  A.    Well, in Los Pinos, it's also the first time. But, a

5  little bit further down, at Los Pinos Ward, many times.

6  Q.    So, you know this... you know Apiadero Ward and Los

7  Pinos Ward, right?

8  A.    Yes, of course, ma'am, because I'm from Villalba.

9        MS. SOTO:    Can I approach to the Witness, Your

10  Honor?

11  BY MS. SOTO:

12  Q.    I'm showing you what has been marked as I.D. 1 from the

13  Government. Please take a look at it, and tell me what I just

14  gave you?

15                        PAUSE

16             (Revision of photograph by Witness.)

17  A.    Well, you gave me an aerial picture.

18  BY MS. SOTO:

19  Q.    Okay, have you ever seen that picture before?

20  A.    Yes, ma'am, I saw it on Friday, in your office.

21  Q.    You recognize what the picture reflects, right?

22  A.    Yes, ma'am.

23  Q.    Okay, and what is that?

24  A.    That is the aerial picture that I saw that day where you

25  can see the sector, the Los Pinos community, the residence

1  which I began to investigate, #8, and, further on, marked with

2  a green circle, the residence that belongs to Luis.

3  Q.    So, that picture reflects the Apiadero Ward and the Los

4  Pinos Ward the same that you were on that day, on October 9,

5  2012, right?

6          MS. RÍOS-FUENTES:   I have an objection, leading.

7          THE COURT:   Sustained. Please rephrase.

8  BY MS. SOTO:

9  Q.    Is it a fair depiction of the Apiadero Ward and the Los

10  Pinos Ward, what you have in your hand?

11  A.    Yes, this is Road #151, which I can identify easily, and

12  Road #562, which go towards *Barrio Apiadero.*

13          MS. SOTO:   Your Honor, we're going to request that

14  I.D. 1 from the Government be marked as Exhibit 1 for the

15  Government... Exhibit 2 for the Government.

16          THE COURT:   It will be 1. You cannot switch. Once

17  it's an I.D., it remains with that number.

18          MS. SOTO:   Okay, okay.

19          THE COURT:   Any objection?

20          MS. RÍOS-FUENTES:   No, Your Honor.

21          THE COURT:   Admitted as Exhibit 1.

22      (Whereupon,

23          the above-mentioned document was admitted into

24  evidence as Government Exhibit 1.)

25          MS. SOTO:   Your Honor, permission to publish?

1          THE COURT:   Yes.

2    BY MS. SOTO:

3    Q.    Looking at that picture, can you please mark the place

4    where you were conducting the surveillance first at Los Pinos

5    Ward?

6    A.    It would be approximately around here.

7    Q.    You can touch the screen and make a mark. You can touch

8    the screen.

9          INTERPRETER:   He did.

10          MS. SOTO:   He did?

11                              PAUSE

12    BY MS. SOTO:

13    Q.    In what point...

14    A.    I want to make clear that it's here, not to the right.

15    Q.    Can you make a point or a mark, like an 'X', on the

16    place approximately where?

17                              PAUSE

18    BY MS. SOTO:

19    Q.    Okay, so that's A-8, in Los Pinos Ward?

20    A.    No, correction. I'm marking the place where I was

21    located that day, and that is an approximate.

22    Q.    Okay, how close were you from the house A-8 and Los

23    Pinos Ward?

24    A.    It was about eighty feet, approximately.

25    Q.    And, you were parked in what direction?

1  A.    From south to north.

2  Q.    Okay, and you were conducting the surveillance there.

3  And, what route did you see the Defendant Luis Guzmán-Batista

4  take when you first saw him?

5  A.    Well, the same direction where I was, but he was coming

6  towards me.

7  Q.    And, can you please, in that picture that is marked as

8  Exhibit 1 for the Government, the place where you saw the

9  Defendant entering?

10                              PAUSE

11  A.    It's not working.

12  BY MS. SOTO:

13  Q.    Ah, it's not working.

14            THE COURT:    Okay, before we erase, do you wish that

15  we can print?

16            MS. SOTO:    Your Honor, because...

17            MR. LÓPEZ:    Yes, Your Honor.

18            MS. SOTO:    Yes, it could be marked (sic). But, the

19  thing is that the last drawing is not what he placed in the

20  picture.

21            COURTROOM DEPUTY:    Mark what you want to erase with

22  your finger.

23            THE COURT:    *Eso último que sale ahí, ¿eso no está*

24  *correcto?*

25  A.    *Ah, no, eso no está correcto.*

1          THE COURT:   *Okey, pues hay una manera de borrarlo.*

2  *Coja con su dedito, y borrelo.*

3                              PAUSE

4          THE COURT:   Well, let's mark it again.

5          MS. SOTO:   Your Honor, I want him to mark in the

6  place where he was conducting the surveillance.

7          THE COURT:   Okay, and then we can print...

8          MS. SOTO:   Exactly.

9          THE COURT:   ... that frame, and mark it. And, then,

10 when he goes to mark another mark, we'll print that one.

11         MS. SOTO:   Okay.

12         THE COURT:   Okay.

13         MS. SOTO:   It was the place where he conducted the

14 surveillance. It wasn't the house.

15         THE COURT:   That's the location where you conducted

16 the surveillance?

17         MR. LÓPEZ:   No, but I... the translation, it was

18 probably the translation. The question was the point where he

19 was making the surveillance.

20         THE COURT:   And, the translation said "the house"?

21         MR. LÓPEZ:   *"La casa"*, exactly.

22         MS. SOTO:   Uh huh.

23 A.    You mean where I was parked?

24 BY MS. SOTO:

25 Q.    Exactly.

1    PAUSE

2  A.    It's approximately around there.

3  BY MS. SOTO:

4  Q.    Okay, and can you please make a mark to the place where

5  you saw lastly the Defendant enter?

6  A.    You mean when I saw him initially prior to arriving to

7  the house or when he arrived to the surveilled house?

8  Q.    No, I'm asking the place where you last saw him on that

9  day, that he entered the house.

10  A.    The last time I saw him around here.

11  Q.    What is the distance between the place that you were

12  parked conducting the surveillance, if you know, and the

13  second house where you saw Defendant Luis Guzmán-Batista

14  enter?

15  A.    We're talking about approximately six hundred meters.

16  Q.    Okay, and, in terms of time, how much did it take you to

17  drive from the house... or where you were parked to the second

18  house where you lastly saw Defendant Luis Guzmán-Batista?

19  A.    It doesn't get to a minute. By car, it's no more than a

20  minute.

21          THE COURT:   Shall we print?

22          MS. SOTO:   Yes, Your Honor.

23                  PAUSE

24          THE COURT:   Any objection that that print be marked

25  as Exhibit 3 (sic)?

1    MR. VÁZQUEZ:   No, Your Honor.

2    MS. RÍOS-FUENTES:   No, Your Honor.

3    THE COURT:   Okay, Exhibit 3, 'Yeli'.

4    (Whereupon,

5    the above-mentioned document was admitted into

6    evidence as Government Exhibit 3.)

7    THE COURT:   Okay, you may proceed without touching

8    the screen. It takes a while.

9    BY MS. SOTO:

10   Q.   And, how much time does it take since the person you

11   saw, Luis Guzmán-Batista, while you were conducting the

12   surveillance at A-8, in Los Pinos Ward, to the time that you

13   lastly saw Luis Guzmán-Batista enter the second house, the one

14   that you said that it was made of wood and zinc? How much time

15   is that?

16   A.   You mean from the moment he entered and exited?

17   Q.   Since the first time you saw him coming to A-8, in Los

18   Pinos Ward, until you saw him entering to the Apiadero Ward

19   house that you said that it was made out of wood and zinc,

20   approximately.

21   A.    Between the moment he entered and existed,

22   approximately six minutes.

23   MS. SOTO:   No further questions, Your Honor.

24   THE COURT:   Cross.

25                    **CROSS EXAMINATION**

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1 BY MS. RIOS-FUENTES:

2 Q.      Good afternoon, Agent Rivera.

3 A.      Good afternoon, ma'am.

4 Q.      Agent Rivera, you stated that you were conducting a

5 surveillance, in Los Pinos. Is that correct?

6 A.      The Los Pinos community, A-8, yes, ma'am.

7 Q.      And, you were conducting this surveillance at ten,

8 twenty-five, approximately. Is that correct?

9 A.      Forty-five.

10 Q.      Ten, forty-five. Is that correct?

11 A.      Yes, ten, forty-five.

12 Q.      So, you arrived eighty feet from A-8 house at around

13 ten, forty-five?

14 A.      Yes, ma'am.

15 Q.      During the time you were conducting the surveillance,

16 did you, at any time, move from where you parked to conduct

17 the surveillance?

18 A.      I moved to follow Luis, that is correct.

19 Q.      So, for approximately an hour, you were parked in the

20 same spot eighty feet from A-8. Is that correct?

21 A.      Let me calculate.

22                          PAUSE

23 A.      Approximately, yes, ma'am.

24 BY MS. RIOS-FUENTES:

25 Q.

1  Q.      And, this road where A-8 is located has houses on both

2  sides. Is that correct?

3  A.      Where I was at, yes.

4  Q.      Okay, and was your car... you were in an unmarked

5  vehicle, right?

6  A.      Yes, ma'am.

7  Q.      And, was your car on for the whole hour or did you turn

8  it off and on during that hour?

9  A.      No, I left it on.

10  Q.      Okay, so you were parked there, in an unmarked car, for

11  an hour before you first saw my client, right?

12  A.      Yes, approximately.

13  Q.      And, from where my client was coming from you do not

14  know?

15  A.      He came in the direction that I was in, the same

16  direction in front of me.

17  Q.      But, other than the general direction, you do not know

18  where he was coming from?

19  A.      Yes, ma'am, that's correct, I didn't know.

20  Q.      Okay, and it's your testimony that my client arrived in

21  a yellow four-track, and parked in front of the A-8 house?

22  A.      Yes, ma'am.

23  Q.      And, he got out of the vehicle, and entered this house,

24  correct?

25  A.      Yes, ma'am.

1   Q.      Where you lost sight of him for approximately five

2   minutes. Is that correct?

3   A.      Approximately, five minutes, yes, ma'am.

4   Q.      When my client came out of the house, he walked towards

5   the four-track. Is that correct?

6   A.      Yes.

7   Q.      At no time did you see him running. Is that correct?

8   A.      No.

9   Q.      Not when he got out, correct?

10  A.      What do you mean "running"?

11  Q.      Running.

12  A.      No, running by foot, no.

13  Q.      When he got off of the four-track to go inside A-8, he

14  did not run towards the house. Is that correct?

15  A.      No.

16  Q.      When he got out of that house and he walked towards the

17  four-track, he didn't run either. Is that correct?

18  A.      No.

19  Q.      In fact, it's your testimony that he got on the four-

20  track, turned it on, and remained standing on the four-track.

21  Is that correct?

22  A.      Yes, ma'am, briefly.

23  Q.      And, then that's when you say that, while facing you,

24  he lifted his sweater, and removed a weapon?

25  A.      Yes.

1  Q.    And, he placed it on his back?

2  A.    Yes.

3  Q.    Agent Rivera, the truth of the matter is that you knew

4  my client. Is that correct?

5  A.    Yes.

6  Q.    And, he knew you, correct?

7  A.    I cannot tell you that, but I know him.

8  Q.    You knew him.

9          So, it's your testimony that, after he pulled out

10 the weapon and put it in his back, he then got on the... took

11 off, turned around, turned the four-track around, and then

12 took off?

13 A.    Yes, he turned it around in front of the surveilled

14 house.

15 Q.    And, you decided to abandon your surveillance and go

16 after my client?

17 A.    That is correct.

18 Q.    You did not intercept my client?

19 A.    No, ma'am.

20 Q.    Even though, according to your testimony, he was

21 driving a four-track on a road, no protective gear, and with a

22 weapon?

23 A.    I did not intervene with him, no, ma'am.

24 Q.    Even though, at the time, you also knew he had an

25 electronic monitoring device?

1  A.     Yes, according to the information that I had, he did

2  have a bracelet.

3  Q.     In fact, before conducting the surveillance, you made

4  sure of that information. Is that correct?

5  A.     Yes.

6  Q.     You corroborated the fact that he had an electronic

7  monitoring device?

8  A.     Yes.

9  Q.     Before the surveillance?

10  A.     Yes.

11  Q.     While you were following him through this road... #562,

12  is it?

13  A.     Yes, ma'am.

14  Q.     And, this is a rural road. Is that correct?

15  A.     Yes, ma'am.

16  Q.     And, in fact, before getting to Road #562, the road

17  where A-8 is located has speed bumps. Is that correct?

18  A.     Yes.

19  Q.     Yes. So, in fact, both the four-track and your car had

20  to slow down to go through those. Is that correct?

21  A.     My car, perhaps, but, the four-track, not always.

22  Q.     Not always. In this case, did he slow down?

23  A.     Normal. He was going normal.

24  Q.     And, what do you call "normal"?

25  A.     He didn't stop to take the speed bumps. He just passed

1  over them.

2  Q.     And, it's your testimony that you followed him out of

3  A-8, towards Road #562?

4  A.     Yes, ma'am.

5  Q.     And, you both had to make a stop before going into Road

6  #562. Is that correct?

7  A.     At least I did.

8  Q.     He didn't?

9  A.     Stop... you know... flat, like me, no. He continued

10  practically continuously.

11  Q.     So, he just crossed towards traffic. Is that what

12  you're saying?

13  A.     Not like you're saying it.

14  Q.     So, in what sense?

15  A.     He reduced his speed a little bit. He did not stop, and

16  he continued on Road #562 up to Apiadero Ward.

17  Q.     But, you did stop?

18  A.     Because I'm in a car, so it's a little bit more

19  difficult, yes.

20  Q.     And, there's traffic. Is that correct?

21  A.     There was none at that moment.

22  Q.     There were no cars at that time?

23  A.     At that moment, no.

24  Q.     So, you followed him, and he keeps going on #562 until

25  he turns left on the first entrance?

1  A.    Yes.

2  Q.    And, the house where he went into, in fact, it's the

3  second house?

4  A.    Yes, interior. The second house is a little bit more

5  inwards. It's not on the road.

6  Q.    It's down, in fact, right?

7  A.    Yes, practically, yes.

8  Q.    And, it's your testimony that he parked the four-track

9  at the right side of the road. Is that correct?

10  A.    Yes, ma'am.

11  Q.    And, the house is at the left side of the road?

12  A.    Yes.

13  Q.    So, he had to cross right in front of your car to get

14  to his house. Is that correct?

15  A.    You mean by the front of my car? No, I stayed at the

16  entrance, close to the slope. He did not have to cross in

17  front of me.

18  Q.    You also told us that this is the second house,

19  correct?

20  A.    Yes.

21  Q.    And, these houses are right at the beginning of the

22  road. Is that correct?

23  A.    The cement ones, not his. His is further down on the

24  inside, inwards, like I had said before.

25  Q.    So, he crossed the road, and he went into the wooden

1 house, correct?

2 A.     Yes.

3 Q.     And, you kept driving straight to that road. Is that

4 correct?

5 A.     No, no, I didn't understand that.

6 Q.     After he went in the house, you kept driving straight?

7 A.     I continued on my way, yes, ma'am.

8 Q.     And, you crossed the bridge. Is that correct?

9 A.     Yes, ma'am.

10 Q.     And, this is a really narrow bridge. Is that correct?

11 A.     One lane only, yes, ma'am.

12 Q.     And, you turned around after the bridge, and stayed

13 there. Is that correct?

14 A.     Correct.

15 Q.     For twenty minutes?

16 A.     Approximately, yes, ma'am.

17 Q.     So, for twenty minutes, you were inside blocking the

18 road of this ward?

19 A.     No, no, no.

20 Q.     No?

21 A.     No.

22 Q.     But, you just told us it's a one car only bridge.

23 A.     I did not stay at the bridge. I was beyond the bridge.

24 Q.     And, isn't it true that, right after the bridge,

25 there's an entrance to a house?

1  A.      There's a house in front, there's one towards the right

2  that goes into the entrance of the ward.

3  Q.      But, you parked... your testimony was that you parked

4  right before the bridge so you could write down the

5  description of the house. Is that correct?

6  A.      After the bridge. After I passed his house, I crossed

7  the bridge, and I stayed after the bridge, after the river.

8  Q.      You crossed the bridge, turned your car around, and

9  parked right before the bridge. Is that correct?

10  A.      Correct.

11  Q.      And, it was your testimony that you stopped right

12  before the bridge for twenty minutes.

13  A.      Before the bridge, but after I had crossed it.

14  Q.      After you turned around and before the bridge, you

15  stopped to write down the description of the house?

16  A.      Correct.

17  Q.      So, you were right before the bridge?

18  A.      Correct.

19  Q.      The bridge you just told us that was a one car bridge,

20  correct?

21  A.      Only one car fits.

22  Q.      Yet, your testimony is that you were not blocking the

23  way?

24  A.      No, of course not.

25  Q.      After those twenty minutes, you left because nothing

1  happened. Is that correct?

2  A.    Yes, ma'am.

3  Q.    And, it was... to Sister Counsel, you said that it

4  takes less than a minute from A-8, where you marked the 'X',

5  to my client's house.

6  A.    Yes.

7  Q.    And, you said that it was six hundred meters. Is that

8  correct?

9  A.    Approximately, yes.

10  Q.    How many feet is that?

11  A.    A thousand-something.

12  Q.    Did you measure?

13  A.    No, I didn't.

14  Q.    Do you know if somebody measured that?

15  A.    Yes, ma'am.

16  Q.    And, that somebody gave you this information?

17  A.    No... well, he told me what he measured, but I

18  calculated the approximate distance.

19        MS. RÍOS-FUENTES:   Just a second, Your Honor.

20                            PAUSE

21  BY MS. RIOS-FUENTES:

22  Q.    And, Mr. Rivera, what... how fast were you going when

23  you were driving behind Mr. Luis Guzmán-Batista?

24  A.    Without looking at the speedometer of the car, it was

25  approximately thirty-five miles.

1  Q.    And, it's your testimony today that, at approximately

2  thirty-five miles, it would take less than a minute?

3  A.    Yes.

4        MS. RÍOS-FUENTES:   I said "*menos*".

5        INTERPRETER:    "*Menos",* I said "*menos".*

6        MS. RÍOS-FUENTES:   Ah, okay.

7  BY MS. RIOS-FUENTES:

8  Q.    And, it's your testimony today that, after you followed

9  Mr. Guzmán from A-8, on that road, to Road #562 and then

10 towards his house, he never appeared to notice your presence?

11 A.    Well, no.

12 Q.    One last question. On that day, how long did it take you

13 from A-8 until you... my client went to his house?

14       MR. VÁZQUEZ:   Asked and answered, Your Honor,

15 objection.

16       THE COURT:   Overruled.

17 A.    Well, approximately, less than a minute.

18 BY MS. RIOS-FUENTES:

19 Q.    At thirty-five miles?

20 A.    Approximately.

21       MR. VÁZQUEZ:   Objection, Your Honor.

22       MS. RÍOS-FUENTES:   No further questions, Your

23 Honor.

24       THE COURT:   Any Redirect?

25       MS. SOTO:   No, Your Honor, we have no questions for

1  the Witness.

2          THE COURT:   You're excused. Thank you.

3                    (Witness is excused.)

4          THE COURT:   Any other evidence on behalf of the

5  Government?

6          MS. SOTO:   No, Your Honor.

7          THE COURT:   Okay.

8          MS. RÍOS-FUENTES:   Your Honor, we have a rebuttal

9  witness.

10         THE COURT:   Who would that be?

11         MS. RÍOS-FUENTES:   Frances Rivas. She should be

12  outside.

13         THE COURT:   Let's take the oath.

14         COURTROOM DEPUTY:   Raise your right hand. Do you

15  swear that all the testimony you're about to give in the case

16  now before the Court is the truth, the whole truth, and

17  nothing but the truth, so help you God?

18         WITNESS:   Yes, I do.

19         COURTROOM DEPUTY:   Thank you. Be seated.

20     (Whereupon,

21                 **MS. FRANCES RIVAS-RODRÍGUEZ**

22  after having been first duly sworn, was examined and testified

23  upon her oath as follows:)

24                 **DIRECT EXAMINATION**

25  BY MS. RIOS-FUENTES:

1  Q.    Good afternoon.

2  A.    Good afternoon.

3  Q.    Could you state your name for the record, please?

4  A.    Yes, my Frances Rivas-Rodríguez.

5  Q.     Who do you work for?

6  A.    I work for the Federal Public Defender's Office.

7  Q.    In what...

8          MR. LÓPEZ:   Your Honor, may we approach?

9          THE COURT:   Yes.

10         MR. LÓPEZ:   We're going to request...

11         THE COURT:   Please approach.

12      MR. LÓPEZ:   Yes.

13 **(INAUDIBLE BENCH CONFERENCE.)**

14         MS. RÍOS-FUENTES:   Your Honor, we do have an e-mail

15 that we can provide. We can forward it because we don't have

16 it printed. It's really short, so...

17         MR. LÓPEZ:   Your Honor, apparently, there are notes

18 of the Investigator in the e-mail that was sent to the

19 Attorney.

20         My position is that maybe it can be sent to the

21 Court so it can be printed.

22         THE COURT:   *¿Tu lo puedes recibir allí, 'Yeli'?*

23         COURTROOM DEPUTY:   *Si.*

24         THE COURT:   Okay, send it. Let's take a five minute

25 break, and then send it to Yelitza's e-mail, and we'll print

1 it... okay... so we can provide copy and keep one, if need be.

2          MR. LÓPEZ:   Yes, thank you, Your Honor.

3          THE COURT:   Okay.

4                  (Off the record.)

5                  (Brief recess.)

6               (Back on the record.)

7          MS. RÍOS-FUENTES:   We have it on a DVD, if it makes

8 it any easier.

9          THE COURT:   What do you have there?

10          MR. VÁZQUEZ:   A video, Your Honor.

11                      PAUSE

12          THE COURT:   Okay, was the e-mail provided?

13          MS. RÍOS-FUENTES:   Yes, Your Honor.

14          THE COURT:   Okay.

15          MS. RÍOS-FUENTES:   May we proceed?

16          THE COURT:   Yes.

17 BY MS. RIOS-FUENTES:

18 Q.   Good afternoon. Your name for the record?

19 A.   Frances Rivas-Rodríguez.

20 Q.   What do you do?

21 A.   I'm a paralegal Investigator at the Federal Public

22 Defender's Office.

23 Q.   How long have you been there?

24 A.   I've been working for thirteen years.

25 Q.   What are your duties?

1  A.    My duties include each of your witnesses' field

2  investigations, take videos, pictures, any task assigned by

3  the attorney.

4  Q.    Have you... are you familiar with the case against Luis

5  Guzmán-Batista?

6  A.    Yes.

7  Q.    Yes. What duties did you perform regarding the

8  investigation of the Luis Guzmán-Batista case?

9  A.    Basically, I visited the area, took pictures. I took a

10  video of the distance between Luis' house and the house the

11  police agent was performing a surveillance, and also took the

12  measurements. Basically, that.

13  Q.    Okay, you said you took videos, pictures, and

14  measurements?

15  A.    Yes.

16  Q.    Okay, in regard specifically to the video, how many

17  videos did you take?

18  A.    I took one video from Luis' residence to Adam's

19  residence and *vice versa*, from Adam's to Luis' residence.

20  Q.    When you took that video from Luis' residence to Adam's

21  residence, how long did it take you to go from one house to

22  the other house?

23  A.    In the vehicle, right?

24  Q.    Yes.

25  A.    At thirty miles per hour... and that was the mileage...

1  it took one minute, eight seconds, from Luis' to Adam's house.

2  Q.    At thirty miles per hour?

3  A.    At thirty miles per hour, approximately.

4          THE COURT:    One minute...

5  A.    Eight seconds.

6  BY MS. RIOS-FUENTES:

7  Q.    And, you said you also took another video?

8  A.    Yes, from Adam's house to Luis' house.

9  Q.    And, how long did it take you to drive that route?

10  A.    One minute, four seconds, at thirty miles per hour...

11  thirty-five... I'm sorry... thirty-five miles per hour.

12  Q.    It took you...

13          MR. LÓPEZ:    Could she repeat the answer, Your

14  Honor. I didn't...

15          THE COURT:    One minute and four seconds, at thirty-

16  five miles.

17          MR. LÓPEZ:    And, that was from Luis' to Adam's?

18          THE COURT:    Adam's to Luis'.

19  A.     No, Adam's to Luis'.

20  BY MS. RIOS-FUENTES:

21  Q.    And, you said you also took a video?

22  A.    That's the video, yeah.

23  Q.    That's from the video?

24  A.    Yes, right, the video... I took video from the distance.

25  Q.    Okay, you would be able to recognize the video...

1  A.    Yes.

2  Q.    ... if we show it to you?

3  A.    Yes.

4                          PAUSE

5            **PLAYING OF VIDEO FOR BENEFIT OF WITNESS.**

6  BY MS. RIOS-FUENTES:

7  Q.    Okay, do you recognize it?

8  A.    Yes.

9  Q.    Yes.

10  A.    That's the entrance of Luis' house.

11  Q.    Okay, can you narrate what you were doing?

12  A.    I was taking the video.

13  Q.    Okay, this is going out from where to where?

14  A.    From Luis' residence to Adam's residence.

15  Q.    And, you were going how, at what speed?

16  A.    Thirty miles per hour.

17  Q.    Do you remember the number of the road?

18  A.    I believe its #562.

19  Q.    So, that video ended at, you said, Adam's house?

20  A.    Adam's house. Adam's is to the left.

21  Q.    This is the house that was under surveillance, according

22  to the police?

23  A.    According to the Sworn Statement, yes.

24                          PAUSE

25         **PLAYING OF SECOND VIDEO FOR BENEFIT OF WITNESS.**

1 BY MS. RIOS-FUENTES:

2 Q.     Okay, and do you recognize this video?

3 A.     Yes.

4         MR. LÓPEZ:   Your Honor, just for the record... and

5 we don't have no problem with it either, so we can even

6 proceed and mark them as exhibit... just to clear the record,

7 the Witness was watching another video. So...

8         THE COURT:   Yes.

9         MR. LÓPEZ:   ... we want just to clarify that the

10 first video is going to be Defendant Exhibit 1...

11         THE COURT:   Are you proffering those into evidence?

12         MS. RÍOS-FUENTES:   Yes, Your Honor.

13         THE COURT:   Okay, it will be 1 and 2, right?

14         MS. RÍOS-FUENTES:   1 and 2, yes.

15         THE COURT:   'Yeli'?

16         COURTROOM DEPUTY:   A and B.

17         THE COURT:   A and B. This will be then Exhibit B.

18         MR. LÓPEZ:   Thank you.

19         THE COURT:   The one we saw already will be A.

20     (Whereupon,

21         the above-mentioned videos were admitted into

22 evidence as Defendant Exhibits A and B.)

23 BY MS. RIOS-FUENTES:

24 Q.     Okay, this video is from where to where?

25 A.     From Adam's house to Luis' house.

1  Q.    And, do you know why the car is jumping?

2  A.    Well, yeah, because, on the street, there were *badenes*

3  (phonetic).

4          THE COURT:    Speed bumps.

5  BY MS. RIOS-FUENTES:

6  Q.    Speed bumps.

7  A.    Okay.

8  Q.    What speed were you going in this video?

9  A.    Thirty-five miles per hour.

10  Q.    You said you also took some measurements. Is that

11  correct?

12  A.    Yes.

13  Q.    What were the measurements you took, from where to

14  where, and what was the result of that?

15  A.    I measured from Luis' house to the entrance of the

16  little house. It's sixty feet.

17  Q.    From Luis' house?

18  A.    Okay, it's the... I can't... if you can... do you have

19  the pictures?

20  Q.    You also took some pictures?

21  A.    Yes.

22          MS. RÍOS-FUENTES:    May I approach the Witness, Your

23  Honor?

24          THE COURT:    Yes.

25  BY MS. RIOS-FUENTES:

1  Q.    I'm showing what has been marked as Defense I.D. C. Do

2  you recognize that?

3                           PAUSE

4                  (Revision of photograph by Witness.)

5  A.    Yes.

6  BY MS. RIOS-FUENTES:

7  Q.    What is that that I've just handed you?

8  A.    This is a picture that depicts a little, blue house,

9  with a zinc roof. That's Luis' hours, and the measurement was

10 taken starting from the balcony, basically, going up to what

11 covers the photo. That distance to the end of this street is

12 sixty feet.

13 Q.    Who took that picture?

14 A.    I did.

15 Q.    You?

16 A.    Yeah.

17         MS. RÍOS-FUENTES:   We move to enter this into

18 evidence, Your Honor.

19         THE COURT:   Any objection?

20         MR. LÓPEZ:   No objection, Your Honor.

21         THE COURT:   Exhibit C.

22     (Whereupon,

23         the above-mentioned photograph was admitted into

24 evidence as Defendant Exhibit C.)

25         MS. RÍOS-FUENTES:   Permission to publish.

1    PAUSE

2  BY MS. RIOS-FUENTES:

3  Q.    So, you're saying that the measurements were made from

4  the balcony until the main road, to the...

5  A.    Yeah, basically, it was what the picture covers. That

6  border of the street is sixty feet.

7  Q.    Okay.

8  A.    Where I'm standing. Where I'm standing taking the

9  picture is sixty feet.

10 Q.    Okay, what other measurements did you take?

11 A.    I measured the width of the bridge. It's ten feet.

12 Q.    Ten feet?

13 A.    Yeah.

14 Q.    Okay, what else?

15 A.    And, from the bridge all the way to Luis' house, it's

16 one hundred and forty-six feet.

17 Q.    Why did you measure from the bridge to his house?

18 A.    According to the Sworn Statement, the agent mentioned

19 that someplace, somewhere, in a bridge, he was like watching

20 the area, and we just wanted to take that measurement.

21 Q.    What other measurement did you take?

22         THE COURT:    Excuse me. It was one, forty-six, you

23 said?

24 A.    One hundred, forty-six feet.

25         THE COURT:    Okay.

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1   A.    Yes.

2   BY MS. RIOS-FUENTES:

3   Q.    What other measurement did you take?

4   A.    The distance from Luis' house to Adam's house. That

5   measured one thousand, nine hundred, seventeen feet... from

6   Adam's... I'm sorry... from Adam's to Luis' house, which is

7   the same distance.

8   Q.    And, what other measurement did you take?

9   A.    I also took the measurement from Adam's to the entrance

10  of the... of his street.

11  Q.    And, how much was that?

12  A.    I believe it's five hundred, fifty-four, if my memory

13  recalls.

14  Q.    Okay, what did you use to take those measurements?

15  A.    I'm sorry?

16  Q.    What did you use to take those measurements?

17  A.    Oh, I took a measure wheel.

18          MS. RÍOS-FUENTES:   Okay, we have no further

19  questions, Your Honor.

20          THE COURT:   Cross.

21          MR. LÓPEZ:   Yes, Your Honor.

22                    **CROSS EXAMINATION**

23  BY MR. LÓPEZ:

24  Q.    Good afternoon, Ms. Rivas.

25  A.    Good afternoon.

1 Q.    Ms. Rivas, you have been working with the FPD for

2 thirteen years, right?

3 A.    Yes.

4 Q.    In this district?

5 A.    Yes.

6 Q.    Okay, what is your experience? What is your background

7 in terms of education?

8 A.    Before working with the Federal Public Defender, I

9 worked for three years in a law firm as a paralegal. I have a

10 Master's Degree in Criminal Justice.

11 Q.    Okay, do you have any experience in engineering?

12 A.    No.

13 Q.    Okay, and performing this kind of job... I mean taking

14 measurements and distance, measuring distance... is that

15 related to your training in terms of your background and

16 education in criminal law?

17 A.    Well, basically, with the years of working in the

18 office and all the cases, basically, we have to learn how to

19 take measurements.

20 Q.    And, how many cases that entail this kind of work that

21 you performed here have you been... have you worked in your

22 office?

23 A.    Well, precisely last week, I was in trial, and I had to

24 take measurements and all that.

25 Q.    Okay, that is one.

1 A.     In thirteen years, I can recall this one, Luis' case. I

2 can't think of anymore.

3 Q.     At least two, this one and the one you were in trial

4 for?

5 A.     For sure, these two. It may be more, but I can't recall

6 right now.

7 Q.     Okay, and how do you take... can you explain to the

8 Judge how you took those measurements that you took in this

9 case?

10 A.     In this case, I took a measure wheel.

11 Q.     Okay, and...

12 A.     How did I take the measurements?

13 Q.     Yes.

14 A.     Oh, I went with another co-worker, another Investigator,

15 and the distance from one house to the other. The other

16 Investigator was sitting in the back of the vehicle while I

17 was driving, and he was taking the measurements.

18 Q.     Okay, and I imagine that, in the process of taking the

19 measurements, somebody there was taking notes, right, because

20 you have to take notes of your findings, right?

21 A.     Yeah, I took the... basically, I wrote it in my...

22 Q.     On a piece of paper?

23 A.     In fact, I took the picture. That's what I did. I took

24 the picture of the measuring wheel.

25 Q.     Okay, and did you take notes in terms of the findings?

1  A.     No, about those measurements, no, only the pictures.

2  Q.     Okay, so all the time that you were taking measurements

3  there and measuring distance, you only were taking pictures of

4  the results?

5  A.     Yes.

6  Q.     You were not taking notes?

7  A.     No.

8          MR. LÓPEZ:   Okay, do you have those pictures,

9  Counsel?

10                                    PAUSE

11  BY MR. LÓPEZ:

12  Q.     I was handed two pictures.

13  A.     I took the pictures.

14  Q.     You only took two pictures of the results of your

15  findings?

16  A.     Of those distances. You should have there the one

17  thousand, nine hundred, seventeen, five hundred, fifty-four

18  and sixty. Sixty feet is the distance from the house to the

19  street.

20          MS. RÍOS-FUENTES:   I didn't print all the pictures.

21  BY MR. LÓPEZ:

22  Q.     But, correct me, if I'm wrong, your testimony here today

23  is that you measured first from Luis' to Adam's house, and

24  then from Adam's...

25  A.     The first video, the first video.

1  Q.    Uh huh, is from Luis' to Adam's?

2  A.    From Luis' to Adam's, and then from Adam's...

3  Q.    And, then from Adam's to Luis'?

4  A.    Yes.

5  Q.    So, in terms of distance, you will have how many results

6  there?

7  A.    Okay, that one you will have to multiply it because...

8  Q.    Explain that to me?

9  A.    ... from Adam's house to Luis' house is one thousand,

10 nine hundred, seventeen. So, from Luis' house to Adam's is the

11 same distance.

12 Q.    Okay, and, from the measurement that you took in front

13 of Luis' house to the street...

14 A.    That's sixty feet.

15 Q.    ... uh huh... where are those?

16 A.    **NO AUDIBLE RESPONSE FROM WITNESS.**

17 Q.    You took pictures of those too?

18 A.    Yes.

19        MR. LÓPEZ:   Do you have those?

20        MS. RÍOS-FUENTES:    **INAUDIBLE RESPONSE FROM COUNSEL.**

21 BY MR. LÓPEZ:

22 Q.     Okay, so there's no picture of those measurements?

23 A.    There is a picture, but...

24 Q.    There is a picture?

25 A.    Yes.

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1  Q.    I'm going to hand to you a picture that I believe...

2            THE COURT:    It's not available here, Counsel, she

3  said, but there is a picture.

4            MS. RÍOS-FUENTES:    I just said I didn't print out

5  all the pictures.

6            THE COURT:    I heard you.

7            MR. LÓPEZ:    I understand that. I printed out all

8  the pictures.

9            THE COURT:    But, she did not.

10           MR. LÓPEZ:    Okay, I'm sorry.

11  BY MR. LÓPEZ:

12  Q.    Okay, when you measured the distance from Luis' house

13  to Adam's house, you were in a vehicle, right, as shown in the

14  video?

15  A.    Yes, that distance, I took it from Adam's to Luis'

16  house.

17  Q.    From Adam's to Luis'?

18  A.    Uh huh.

19  Q.    And, that is the video that was marked as Defendant

20  Exhibit...

21  A.    A.  .. no, that would be B, from Adam's to...

22  Q.    Exhibit 2, the second video that we watched?

23           THE COURT:    B.

24  A.    B.

25           MR. LÓPEZ:    B, I'm sorry.

1  BY MR. LÓPEZ:

2  Q.    But, you were in a vehicle, right?

3  A.    Yes.

4  Q.    And, who was driving the vehicle?

5  A.    I was driving the vehicle.

6  Q.    You were driving the vehicle?

7  A.    Yes.

8  Q.    And, who was holding the phone?

9  A.    The... okay, there was... there is the video of the

10 timing. That's the video you just saw, the timing from one

11 house to the other, and then *vice versa*.

12 Q.    Okay.

13 A.    Okay, the distance, there's no video of how long is the

14 distance. There is a picture.

15 Q.    Then, in terms of the time, how much will it take you

16 from one house to another?

17 A.    That's the video you just sw.

18 Q.    That's the video, right?

19 A.    Yes.

20 Q.    And, I'm asking you, while taking those measurements,

21 you were driving the vehicle, and who was holding the phone?

22 A.    With the... no, you're mixing things. The measurement

23 with the measure wheel...

24 Q.    I know.

25 A.    ... I was driving, and my co-worker was taking the

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1  measurement.

2  Q.      I understand that.

3  A.      And, I took the picture of the length.

4  Q.      Uh huh.

5  A.      The video about the timing, my co-worker is driving,

6  and I'm taking the video.

7  Q.      Ah, your co-worker is driving, and you're taking the

8  video?

9  A.      Right.

10 Q.      And, I'm asking who was holding the phone that appears

11 in the video showing the time?

12 A.      My co-worker, the other Investigator.

13 Q.      Okay, so, actually, you were not watching, at the time

14 you were taking the video, the speedometer?

15 A.      He was... in fact, you couldn't hear it, but you can

16 hear his voice saying the miles.

17 Q.      So, he was yelling the miles that he was going?

18 A.      Yes.

19 Q.      Okay, and what type of vehicle is this?

20 A.      That's a Ford Escape.

21 Q.      A Ford Escape?

22 A.      Yeah.

23 Q.      And, it is your finding that, from Luis'... from

24 Adam's... I'm sorry... from Adam's house to Luis' house, at

25 thirty-five miles an hour, it will take you a minute and four

1  seconds, right?

2  A.     From Adam's to Luis' house, right, at thirty-five

3  miles.

4  Q.     At thirty-five miles an hour?

5  A.     Yes.

6  Q.     But, the truth is that that is not a constant speed,

7  the thirty-five miles. Is that correct, "yes" or "no"?

8  A.     Well, I would say yes.

9  Q.     Yes?

10 A.     Because you can hear... yes, obviously, you start slow

11 and then you can accelerate in distance.

12 Q.     So, you're telling the Court that you never stopped or

13 reduced your speed...

14 A.     No.

15 Q.     ... in the vehicle?

16 A.     Uh uh.

17 Q.     No?

18 A.     No, obviously, just to turn left to enter the

19 residence. You have to slow the pace.

20 Q.     You don't have to make a stop at any point?

21 A.     No, once you get out of the street where Adam lives,

22 where you have to turn left, there is a free road, so you can

23 go at thirty, thirty-five miles.

24 Q.     And, what about the speed bumps, you never...

25 A.     The speed bumps are in the...

1  Q.     ... reduced your speed...

2  A.     No.

3  Q.     ... while taking the speed bumps?

4  A.     No.

5  Q.     No?

6  A.     You can see that, that the camera is moving, and he

7  never stops.

8  Q.     So, if we play the video again, it will show that you

9  were constantly at thirty-five miles an hour?

10  A.     Obviously, that's a residential area. You can't

11  (phonetic) go thirty-five miles per hour.

12  Q.     But, you were going at thirty-five miles an hour or

13  not?

14  A.     In the main road, at #562.

15  Q.     Ah, so you reduced your speed when you entered the

16  residential area. Is that your testimony, "yes" or "no"?

17  A.     You...

18  Q.     "Yes" or "no", ma'am? You reduced your speed when you

19  entered the residential area?

20  A.     Yes, you have to reduce the speed.

21  Q.     Okay, and...

22  A.     Remember that the miles per hour...

23  Q.     Thank you.

24  A.     ... is in the main road.

25  Q.     Thank you, thank you, I got it. Okay, and the truth is

1  also that an ATV is faster than a car in terms of

2  acceleration?

3  A.    I can't say. I don't have...

4  Q.    You don't know?

5  A.    I can't say. I don't have a four-track.

6  Q.    So, in terms of acceleration, you don't know if an ATV

7  can accelerate faster than a vehicle?

8  A.    Uh uh.

9  Q.    You don't know that?

10  A.    Not personally, myself (phonetic).

11  Q.    And, actually, an ATV doesn't have to stop for the speed

12  bumps because of the type of vehicle. Is that correct?

13  A.    I don't know.

14        MR. VÁZQUEZ:    Objection.

15        THE COURT:    She said she doesn't know. Sustained.

16  BY MR. LÓPEZ:

17  Q.    So, in terms of your findings as to the time that it

18  will take, at thirty-five miles an hour, from Adam's house to

19  Luis' house, the truth is that it was not a constant speed of

20  thirty-five miles an hour, "yes" or "no"?

21  A.    Basically, when...

22  Q.    "Yes" or "no"?

23        MR. LÓPEZ:    Your Honor...

24  A.    Okay, no.

25        MR. LÓPEZ:    ... I'm asking a "yes" or "no"

1   question.

2              THE COURT:   She said "no".

3              MR. LÓPEZ:   No. We don't have no more questions,

4   Your Honor.

5              THE COURT:   Redirect, any?

6              MS. RÍOS-FUENTES:   **NO AUDIBLE RESPONSE FROM**

7   **COUNSEL.**

8              THE COURT:   Any Redirect?

9              MS. RÍOS-FUENTES:   No, Your Honor.

10             THE COURT:   Okay, you're excused. Thank you.

11                   (Witness is excused.)

12             THE COURT:   You need to provide the videos so we

13  can keep them.

14             MS. RÍOS-FUENTES:   Yes, we have the videos.

15             THE COURT:   Any other rebuttal?

16             MR. VÁZQUEZ:   No, Your Honor.

17             THE COURT:   No, okay. That concludes the matter

18  then? Are we then done?

19             MR. VÁZQUEZ:   Yes, Your Honor, we are.

20             THE COURT:   Okay.

21             MR. LÓPEZ:   Well...

22             THE COURT:   Mr. López.

23             MS. SOTO:   Your Honor, can we have a second?

24             THE COURT:   Yes.

25             MR. LÓPEZ:   Just to confer something, Your Honor.

1    THE COURT:   No problem.

2                      PAUSE

3    MR. LÓPEZ:   Submitted, Your Honor.

4    THE COURT:   Okay, thank you. Have a good day.

5    MR. VÁZQUEZ:   Good afternoon, Judge.

6    THE COURT:   Likewise (phonetic).

7    (Whereupon,

8    the hearing in the above-mention proceeding was

9    terminated.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1    TRANSCRIBER CERTIFICATION

2

3         I, CRYSTAL INCHAUSTEGUI BREAZ, Transcriber, do

4    hereby certify that the foregoing transcript was transcribed

5    by me to the best of my abilities.

6

7         I CERTIFY that all "(inaudible)", "(phonetic)", and

8    "(unintelligible)" were carefully reviewed and found to be as

9    written.

10

11        I FURTHER CERTIFY that I am not interested in the

12   outcome of the case mentioned in said caption.

13

14                   S/ CRYSTAL INCHAUSTEGUI

15                   CRYSTAL INCHAUSTEGUI BREAZ

16

17        I, DIANE BREAZ, RPR and Official Court Reporter for

18   the District Court of Puerto Rico, certify that the foregoing

19   transcript has been verified and certified by me.

20

21                   S/ DIANE BREAZ

22                   DIANE BREAZ

23

24

25

**CERTIFIED TRANSCRIBERS, INC.**
1075 Carr. 2 Cond. Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487