# United States Court of Appeals
## For the First Circuit

No. 14-1059

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS A. GUZMÁN-BATISTA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Liza L. Rosado-Rodríguez, Research and Writing Specialist, with whom Héctor E. Guzmán-Silva, Jr., Federal Public Defender, and Héctor L. Ramos-Vega, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

April 22, 2015

**TORRUELLA, Circuit Judge**. Defendant-Appellant Luis A. Guzmán-Batista ("Guzmán") appeals the district court's decision, following a de novo Franks hearing, rejecting the magistrate judge's report and recommendation and denying Guzmán's motion to suppress evidence seized following a search of his home. Specifically, Guzmán argues that the district court erred by failing to take into account certain facts which purportedly established that the agent's sworn statement in support of the warrant contained false statements, and that without those statements, probable cause for the warrant was lacking. Because this argument effectively boils down to a credibility determination -- something the district court is in a much better position to evaluate than we are -- we affirm.

## I. Background

### A. The Warrant and Subsequent Search

On October 17, 2012, Puerto Rico Police Agent Héctor L. Rivera-Torres ("Agent Rivera") applied for a search warrant in the Superior Court of Puerto Rico, Ponce Part. According to his sworn statement in support of the warrant, on October 9, 2012, at approximately 10:45 a.m., Agent Rivera arrived at the Los Pinos ward in Villalba, Puerto Rico in an unmarked car. He parked in front of unit #A-8, a white two-story residence with gray balcony columns, which was occupied by Adam Rodríguez León, a suspect in a marijuana investigation. After surveilling unit #A-8 for

approximately one hour, Agent Rivera observed Guzmán -- whom he recognized as a defendant accused of murder and on pre-trial release -- arrive on a "yellow four track" all-terrain vehicle ("ATV"). Guzmán entered unit #A-8 and was inside for approximately five minutes before coming out and returning to the ATV. Agent Rivera observed Guzmán stand on the ATV, raise his sweater, remove a gray pistol from the front of his waistband, and move it to the back of his waistband. Guzmán then started the ATV and drove away. Agent Rivera chose to follow Guzmán and observed him make the first left-hand turn into the Apeadero ward, stop on the right hand side of the street, get off the ATV, cross the street, and enter the right side of a cream-colored wood and zinc residence with a rusted roof and Miami windows. Agent Rivera waited for approximately twenty minutes but Guzmán never reemerged from the residence.

Based on his observation of Guzmán's presence at a location thought to be involved in narcotics trafficking and his observation of the pistol, Agent Rivera sought a search warrant for the cream-colored wood and zinc home. The warrant was issued, and the subsequent search uncovered six 9mm bullets.

**B. The Proceedings**

Because Guzmán was under indictment on state murder charges, his possession of the six 9mm bullets violated 18 U.S.C.

§ 922(n),[1] and he was accordingly indicted on October 24, 2012. On January 8, 2013, Guzmán filed a motion to suppress, alleging that the ammunition was discovered pursuant to a state search warrant filled with false statements, without which probable cause could not have been found. Specifically, Guzmán argued that it was not possible for Agent Rivera to have observed him at unit #A-8 with the gun because he was wearing an electronic monitoring device as part of his pre-trial conditions for his state murder case and the device did not issue any out-of-range alerts during the time period in question. He therefore requested a Franks hearing.[2] Guzmán's motion was referred to a magistrate judge for a report and recommendation (R&R).[3]

---

[1] 18 U.S.C. § 922(n) makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

[2] "A defendant who believes that the police included false statements or material omissions in an affidavit underlying a search warrant may request an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154, 155-56 (1978)." United States v. Materas, 483 F.3d 27, 28 n.1 (1st Cir. 2007).

[3] 28 U.S.C. § 636(b)(1)(B) permits a district judge to "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court."

## 1. **Proceedings Before the Magistrate Judge**

Having determined that Guzmán had met the requirements for a Franks hearing,[4] the magistrate judge held the hearing on March 5, 2013. Guzmán initially presented two witnesses. The first witness, Guzmán's mother Ada Batista, testified that as part of his pre-trial conditions, Guzmán was required to stay inside his home unless he was granted permission to go to court or the hospital. She added that she was at the house on October 9, 2012, at 11:45 a.m., and while she had not seen Guzmán personally, she would have known if he was not there because the electronic monitoring device would have given off a loud alert if he had left the premises.

The second witness was Yashira Silva-González ("Silva"), the supervisor of the Arrest Unit of Puerto Rico's Pre-Trial Services Office which oversaw Guzmán's home monitoring. Silva explained that the electronic monitoring system used a radio frequency and was composed of two parts: a receiving unit and a bracelet worn by Guzmán at all times. She further explained that Guzman's system had a medium perimeter extending between 75-150

---

[4] "A defendant is entitled to an evidentiary hearing under Franks where the defendant 'makes a substantial preliminary showing' that both (1) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" United States v. Reiner, 500 F.3d 10, 14 (1st Cir. 2007) (quoting Franks, 438 U.S. at 155-56).

feet from the receiving unit and a six-minute grace period.  In other words, if the bracelet was outside of the perimeter for more than six minutes, an alert would issue.  The alert would be audible in the premises and would also be electronically sent to the Pre-Trial Services Office.  Silva testified that Pre-Trial Services had received twenty-three alerts from Guzmán's electronic monitoring device between December 1, 2011, and October 16, 2012, but none on October 9, 2012.  She also testified that Guzmán's file showed numerous attempts to "manipulate" the electronic monitoring device so it would not register an alert, but that there was no "manipulation" alert[5] registered on October 9.  In response to a question from the magistrate judge, Silva testified that there was evidence that Guzmán's electronic monitoring device was working that day.[6]

The government presented only one witness: Agent Rivera.  Agent Rivera reiterated what was contained in his sworn statement supporting the search warrant but provided additional details about the incident.  He testified that he was parked 80 feet from unit #A-8 and did not know where Guzmán was coming from when Guzmán

---

[5] Silva testified that a "manipulation" alert was different than a "violation-of-the-perimeter" alert and that her office knew the reason behind each alert it received.

[6] The receiving unit receives sporadic "hello" communications to indicate that the electronic monitoring system is operational. Silva testified that such a communication was received on October 9, 2012.

first arrived at the home. Regarding the travel between unit #A-8 in the Los Pinos ward and Guzmán's home in the Apeadero ward, Agent Rivera stated that the two houses were only 600 meters apart. He testified that both he and Guzmán were driving at "normal" speed -- approximately 35 miles-per-hour -- and while he slowed down for speed bumps, Guzmán did not. Guzmán did, however, slow down when making the turn. According to Agent Rivera, it took no more than a minute to travel between the two houses and that it was approximately six minutes from the time he first saw Guzmán until Guzmán entered his home. Finally, Agent Rivera could not explain why he failed to arrest Guzmán on October 9, given that he knew Guzmán was under house arrest and that he had observed Guzmán with the handgun.

In rebuttal, Guzmán called Frances Rivas-Rodríguez ("Rivas"), a paralegal/investigator at the Federal Public Defender's Office. Rivas testified that the distance from Guzman's home to the border of the street is 60 feet, from Guzmán's home to unit #A-8 is 1,917 feet, and from the entrance of the street to the entrance of unit #A-8 is 554 feet. In addition, Rivas presented videos of her driving between Guzmán's house and unit #A-8 at both 30 and 35 miles-per-hour; at 30 miles-per-hour the trip took one minute and eight seconds, whereas it took one minute and four seconds at 35 miles-per-hour. She admitted reducing her speed when

she turned into the wards and was unable to say if traveling in an ATV would be faster than in a car.

On April 11, 2013, the magistrate judge issued her R&R. She found that Guzmán's electronic monitoring device was working properly on October 9, 2012, and thus in order to believe the version of the facts presented by the government and Agent Rivera, everything described by Agent Rivera must have occurred in less than six minutes. According to the R&R, this was "inconceivable" because there was no way, given that Guzmán was in unit #A-8 for approximately five minutes, that he was able to arrive at unit #A-8 from an unknown location, exit unit #A-8, get on his ATV, and return to his own home in less than one minute, all without realizing that he was being followed. The R&R also found it "troubling" that Agent Rivera testified that the whole encounter took approximately six minutes -- the exact time of the grace period -- yet never stated this in his sworn statement in support of the warrant. It also emphasized that the six minutes observed by Agent Rivera failed to take into account the time Guzmán must have been outside the perimeter before arriving at unit #A-8. Finally, the R&R found it "difficult to believe" that Agent Rivera chose not to detain Guzmán on October 9 -- despite being aware that he was violating the terms of his pre-trial release and observing him with a firearm -- and instead waited eight days before seeking a search warrant.

As a result, the R&R "f[ou]nd the version of facts as testified by PRPO Rivera-Torres and as similarly included in the sworn statement in support of the state search warrant to be too incredible to believe." It also concluded that the sworn statement in support of the search warrant "had false and/or misleading information in reckless disregard of the truth and that without such information the sworn statement would not have sufficed to establish probable cause for the state search warrant." It therefore recommended that the district court grant Guzmán's motion to suppress.

**2. Proceedings Before the District Court**

The government filed objections to the R&R and requested a <u>de novo</u> hearing.[7] The district court granted this request, explaining that "the magistrate judge's recommendations are based on her credibility determinations of the witnesses" and that it would be improper for the district court to decide the issue

---

[7] 28 U.S.C. § 636(b)(1) provides that, "[w]ithin fourteen days after being served with a copy, any party may serve and file written objections" to a magistrate judge's proposed findings and recommendations. "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." <u>Id.</u>; <u>see also</u> <u>United States</u> v. <u>Hernández-Rodríguez</u>, 443 F.3d 138, 147-48 (1st Cir. 2006) ("The Supreme Court has held that a district judge need not hear the live testimony of a witness in order to <u>accept</u> the credibility determination of a magistrate judge. However, . . . . absent special circumstances, a district judge may not reject the credibility determination of a magistrate judge without first hearing the testimony that was the basis for that determination." (internal citation omitted)).

"without first hearing the testimony that was the basis for that determination."

The de novo hearing took place on July 2, 2013. Guzmán provided essentially the same evidence via testimony from Batista (through an agreed-upon proffer) and Silva. At the close of this evidence, the government argued that Guzmán had not met his burden, and thus asked the district court to deny the motion to suppress. The district court refused, however, and strongly urged the government to call Agent Rivera to testify because the district court "d[id]n't have any evidence that [Guzmán] was outside the house. So . . . it would be to the Government's benefit to show that he was outside the house." It added that "if the agent says, 'I saw him outside the house,' even though he was within the perimeter for less than six minutes, that may be sufficient for me. I don't know."

In response, the government called Agent Rivera, who provided the same information as at the initial hearing before the magistrate judge and in his sworn statement in support of the warrant. He added, however, a few additional details. First, Agent Rivera testified that it only took "a matter of seconds" for Guzmán to leave unit #A-8 in Los Pinos, return to the ATV, turn it on, move the gun from the front of his waistband to the back, and begin moving. He added that he followed Guzmán "at a prudent distance" and observed Guzmán pass over the speed bumps "quickly"

and not slow down as he made the left-hand turn into the Apeadero ward.  Finally, Agent Rivera testified that he was traveling "around 35, 40" miles-per-hour and that Guzmán "was going a little faster."

On cross-examination, Agent Rivera stated that he did not use a camera or take any pictures during his surveillance that day. He also explained that he did not detain Guzmán when he saw him in violation of his pre-trial conditions and carrying the handgun "for safety purposes."[8]  Finally, Agent Rivera conceded that evidence in a prior case he was involved in was suppressed because the Puerto Rico Commonwealth court determined that Agent Rivera's testimony was "stereotype," "unreal," and "improbable."

The government also presented the testimony of Vladimir González, an agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and a former engineer.  Agent González testified that the distance from Guzmán's house to the road was 110 feet, and thus was contained within the 75-150 feet perimeter of the electronic monitoring device.  He further testified that he measured the distance between the two houses and arrived at a distance of "around 1,802 feet."  Thus, at a constant speed of 25 miles-per-hour (i.e., not including slowing down for speed bumps or turns), it would take forty-nine seconds to travel between Guzmán's

---

[8] Agent Rivera elaborated on redirect that his safety concern came about because he "saw that [Guzmán] had a weapon" and because he was conducting surveillance by himself, without any backup.

house and unit #A-8; at 30 miles-per-hour it would take around forty seconds. On cross-examination, Agent González stated that this latter calculation was only an estimate.

Finally, Guzmán once again presented Rivas as a rebuttal witness. She gave the same testimony as she did in the initial <u>Franks</u> hearing and introduced the same videos into evidence. On cross-examination, she conceded that she was not an engineer.

After hearing all of this evidence, the district court announced its decision from the bench. It stated as follows:

> First of all, I find, based on evidence I believe credible, that Defendant Guzmán violated the Commonwealth Court order that he remain inside his house.
>
> Whether he was inside the perimeter during the time he was outside the house or whether he had been outside the perimeter for less than the six-minute grace period during the time he was outside the house is not of importance to the Court.
>
> The perimeter and the six-minute grace period are not part of the State Court's order but an administrative matter established by the pretrial office so as not to congest the system with alerts.
>
> The fact that Defendant Guzmán-Batista violated the conditions imposed is only important to show that he was out of his residence, not to show that probable cause existed for a search warrant.
>
> But the evidence that the Court believes credible also consists [of the fact] that Defendant Guzmán-Batista was outside the house, in which he had to remain, on a Yamaha Banshee four-track and that he removed the gray pistol from his front waistband and

>placed it in his back waistband. That gave
>Agent Rivera probable cause to obtain a search
>warrant for the house into which Defendant
>Guzmán-Batista entered, the wooden house with
>the rusty zinc roof and the Miami windows.
>
>The magistrate judge focused on the
>fact that there was no alert because she found
>that Defendant Guzmán-Batista was either
>within the perimeter or outside the perimeter
>for less than six minutes, but I don't think
>that's important here.
>
>Therefore, I am going to reject the
>magistrate's report and recommendation and
>allow the evidence to be presented.

Guzmán subsequently entered a conditional plea of guilty on September 12, 2013, reserving his right to challenge the district court's ruling on his motion to suppress. On December 12, 2013, he was sentenced to thirteen months of imprisonment and three years of supervised release. He now timely appeals.

## II. Discussion

Guzmán argues that the district court erred when it denied his motion to suppress because it should not have accepted the version of events as described by Agent Rivera and the government. In other words, the district court committed reversible error when it credited Agent Rivera's testimony. We disagree.

While we review a district court's ultimate decision to suppress evidence obtained pursuant to a warrant de novo, the "factual findings made by a district court in connection with a

Franks hearing are reviewed for clear error."[9]  United States v. Tzannos, 460 F.3d 128, 135-36 (1st Cir. 2006).  Clear error exists when there is a "definite and firm conviction that a mistake has been committed."  Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985) (internal quotation marks omitted).  Under any set of circumstances, clear error is "not an easy standard to meet." United States v. Kinsella, 622 F.3d 75, 86 (1st Cir. 2010).  This is particularly true, however, when the challenge is to a witness's credibility, due to our "inability to see witnesses face-to-face or to appraise in person their demeanor and inflection."  United

---

[9] Guzmán argues that the district court failed to make factual findings on the record, and thus the more lenient de novo standard applies.  This argument lacks merit.  A district court is not required to make written findings of fact; rather, it is only required to "state its essential findings on the record," Fed. R. Crim. P. 12(d), so we may review the record in a "reasoned and meaningful manner," United States v. Fields, 371 F.3d 910, 916 (7th Cir. 2004) (internal quotation marks omitted). Here, the district court specifically stated that: "based on evidence [it] believe[d] credible, that Defendant Guzmán violated the Commonwealth Court order that he remain inside his house"; it "believe[d] credible . . . that Defendant Guzmán-Batista was outside the house, in which he had to remain, on a Yamaha Banshee four-track and that he removed the gray pistol from his front waistband and placed it in his back waistband"; and "[t]hat gave Agent Rivera probable cause to obtain a search warrant for the house into which Defendant Guzmán-Batista entered, the wooden house with the rusty zinc roof and the Miami windows."  It also explained that it did not think it was important or necessary to its determination whether or not Guzmán was outside the perimeter for less than six minutes.  These are obvious findings of fact which are more than sufficient for us to review the record in a reasoned and meaningful matter.  Thus, clear error is the appropriate standard.  Cf. United States v. Carrigan, 724 F.3d 39, 45 (1st Cir. 2013) (explaining that the standard of review is de novo when the district court fails to make any findings of fact).

States v. Henderson, 463 F.3d 27, 32 (1st Cir. 2006) (internal citations and quotation marks omitted). Accordingly, we are "especially deferential to the district court's credibility judgments." Id. (internal citations and quotation marks omitted); see also Anderson, 470 U.S. at 575 (explaining that a challenge based on a district court's credibility determination "can virtually never be clear error"). Indeed, absent objective evidence that contradicts a witness's story or a situation where the story itself is so internally inconsistent or implausible that no reasonable factfinder would credit it, Anderson, 470 U.S. at 575, "the ball game is virtually over" once a district court determines that a key witness is credible. Rivera-Gómez v. de Castro, 900 F.2d 1, 4 (1st Cir. 1990).

Here, the district court heard all the testimony, observed Agent Rivera's demeanor, and "believe[d] credible" Agent Rivera's testimony that "Defendant Guzmán-Batista was outside the house, in which he had to remain, on a Yamaha Banshee four-track and that he removed the gray pistol from his front waistband and placed it in his back waistband." This finding is effectively "game over" for Guzmán. See id.

In an attempt to get around this, Guzmán hinges his entire claim on the assertion that because the electronic monitoring device never sent an alert, everything described by Agent Rivera must have occurred within the six-minute grace period

permitted by the electronic monitoring device. He claims that not only is this assertion so implausible that it should not be credited, but also that he provided objective evidence proving that it is impossible. We have carefully reviewed the transcripts of both <u>Franks</u> hearings and come to a different conclusion. Agent Rivera testified that Guzmán was inside unit #A-8 for "approximately" five minutes and it only took a matter of seconds for Guzmán to exit the house, reposition the gun, and leave the premises. Agent González, meanwhile, testified that at thirty miles-per-hour, it would take around forty seconds to travel between the two houses, and Agent Rivera testified that Guzmán was traveling faster than that. Moreover, the distance between the road and the entrance to Guzmán's house was only 110 feet, and thus could have been contained within the perimeter of the electronic monitoring device. As a result, it is possible for the events to have occurred within the six-minute grace period, with time left over for Guzmán to have left the perimeter and arrived at unit #A-8 before first being seen by Agent Rivera. It is also important to remember that all of Agent Rivera's observations were approximations, and thus the events could have transpired even more quickly.

Admittedly, it is a bit convenient that Agent Rivera's observation of Guzmán coincided perfectly with the timing of the grace period. However, the government provided multiple

explanations.  First, it argued that Guzmán had numerous alerts for violating the electronic monitoring device.  It is reasonable to believe that, through these alerts, Guzmán learned that he had six minutes before an alert would be sent, and thus tailored his behavior accordingly.  Second, the government posited that Guzmán's file noted multiple "manipulation" attempts.  It is also possible, they argued, that he had succeeded in manipulating the system so that he could violate the perimeter for more than six minutes without setting off the alert.  The burden of persuasion is on Guzmán, not the government, and given the evidence presented of multiple alerts and numerous violations of his pre-trial conditions, neither of these scenarios are "so implausible" that no reasonable factfinder could credit Agent Rivera's testimony.  See Anderson, 470 U.S. at 575.

Guzmán does present compelling evidence.  However, as just explained, this evidence is not "objective evidence that contradicts [Agent Rivera's] story." Id.  At most, it creates two possible alternative versions of the events of October 9, 2012.  The first is the consistent story described by Agent Rivera in his sworn statement in support of the warrant and at both Franks hearings; the second is, as Guzmán argues, that Agent Rivera fabricated his entire observation as a ruse to gain access to Guzmán's residence.  The district court credited Agent Rivera's version of events, and "a district court's choice between two

plausible competing interpretations of the facts cannot be clearly erroneous."  Henderson, 463 F.3d at 32 (quoting United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003)); Rivera-Gómez, 900 F.2d at 4 (explaining that "[o]nce credited," the defendant's testimony "supported the district court's rationale almost singlehandedly" because the "[d]efendant's testimony was neither severely impeached nor inherently improbable").

### III.  Conclusion

Though Guzmán presents a strong case that the version of events described by Agent Rivera may not be true, we see nothing in the record to definitely and firmly convince us that a mistake has been committed by the district court.  At the end of the day, this was a credibility determination by the district court, and we will not second-guess its decision to credit Agent Rivera's testimony as credible after it heard all the testimony and observed all of the witnesses' demeanors firsthand.  Having found Agent Rivera's testimony -- and thus his sworn statement in support of the warrant -- to be credible, there was easily probable cause to issue the search warrant.  Guzmán's motion to suppress was properly denied.

**AFFIRMED**.